[No. A059403. First Dist., Div. Five. Aug. 12, 1994.]

CITY OF BERKELEY, Plaintiff and Appellant, v.
CITY OF BERKELEY RENT STABILIZATION BOARD, Defendant and
Appellant;
BERKELEY PROPERTY OWNERS' ASSOCIATION, Intervener and
Appellant.

954

**COUNSEL**

Myron Moskovitz, McDonough, Holland & Allen and Michelle Marchetta Kenyon for Plaintiff and Appellant.

Marcia Rosen, Anthony A. Trendacosta and Ralph H. Goldsen as Amici Curiae on behalf of Plaintiff and Appellant.

Goldfarb & Lipman and Richard A. Judd for Defendant and Appellant.

Thomas A. Seaton and Susan Burnett Luten for Intervener and Appellant.

Dagmar Searle, Lawrence & Harding, Christopher M. Harding, Kenneth L. Kutcher, Carl J. Lambert and Michael N. Koenig as Amici Curiae on behalf of Defendant and Appellant and Intervener and Appellant.

## OPINION

**PETERSON, P. J.**—The ultimate legal question presented in this litigation is this: Did the City of Berkeley Rent Stabilization Board (Board) abuse its discretion, by exceeding the authority and powers imposed by its enabling ordinance, when it adopted new regulations it contends were designed to avoid unconstitutional confiscatory effects on landlords and to ensure landlords fair and reasonable levels of rents producing a fair return on their investment, as our Supreme Court has ruled to be constitutionally required? We will hold, in partially affirming and partially reversing the lower court, that the Board did not abuse its discretion in adopting these regulations and acted wholly within its authority in promulgating them.

The regulatory actions challenged here are as follows:

First, after public hearings and the receipt of expert economic evidence, the Board provided for a one-time increase in rent levels. It did so because it concluded its previous regulatory provisions had not adequately allowed rents to be adjusted for inflation, in accordance with the decision of our Supreme Court in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 169 [130 Cal.Rptr. 465, 550 P.2d 1001] (*Birkenfeld*) and of this court in *Searle* v. *City of Berkeley Rent Stabilization Board* ▐(Cal.App.) (*Searle II*)[1] hereinafter discussed. The Board also determined that rent levels should in the future receive annual general adjustments (AGA) for inflation in compliance with *Birkenfeld* to provide a just and reasonable return to landlords on their investments. The Board's AGA formula provided for a consumer price index (CPI) factor, multiplied by an estimated percentage of landlord rents. That percentage of landlord rents included the cost of debt service, the Board having heard evidence that debt service exclusion therefrom would erode landlords' net income over time.

Second, the Board determined (without timely objection by any party to this appeal) that it should use the 1980 rents, which it had previously

[1]We cite and quote from the unpublished *Searle II* decision because it is relevant here as providing the "law of the case." (Cal. Rules of Court, rule 977(b)(1).)

certified as accurate for each City of Berkeley (City) rental unit, as the base rent on which rental adjustments would be annually calculated to compensate for inflation.

Third, the Board determined that in order to harmonize these actions with the Board's preexisting methods of regulating rents by indexing net operating income (NOI), these adjustments should be made for all rental units, without creating an exception for those purchased by landlords after the inception of rent control in City under the current ordinance in 1980.

Fourth, the Board determined that the rents of certain units could be adjusted upward if those rents had been far below the rents of comparable units, when frozen at the time of the inception of City rent control. The Board undertook this action in order to comply with *Birkenfeld* and its progeny, in providing landlords with a fair return on their investments.

Fifth, the Board determined certain below-market rent levels should be raised for units with historically low rents. The Board defined these historically low rents, in its regulation 1280, as those which were less than "seventy-five percent (75%) of the Department of Housing and Urban Development [hereafter HUD] fair market rents established for existing housing in Alameda County in 1979 under Section 8 of the United States Housing Act of 1937 . . . ." This rent adjustment was also designed to implement the requirement of *Birkenfeld* that rents not be perpetually frozen at unreasonably low levels.

The Board acted properly. There was no prejudicial abuse of discretion, and the Board's actions were consistent with its statutory authority and the mandates contained in the case law. We will remand this matter to the trial court with instructions to deny wholly the writ of mandate which sought to overturn these validly enacted regulations.

## I. Legal, Factual, and Procedural History

In order to provide necessary factual background for the legal issues presented by this appeal, we must review four preliminary matters. First, we briefly summarize the prior legal history of rent control litigation in City and elsewhere in California, as treated in ordinances and prior court decisions, in order to explain the problems which led to the enactment of the rent control regulations challenged here. Second, we analyze the explicit and implicit authority of the Board as here pertinent, both as derived from legal precedents and from its enabling ordinance. Third, we summarize the evidence presented to the Board, and the other relevant proceedings at the administrative level. Fourth, we explain the somewhat unusual procedural history of this particular litigation, in order to clarify the issues in dispute on appeal.

## A. *Legal Precedents*

City first enacted rent control in 1972, by an initiative measure which amended the City Charter (Charter) to prohibit any rent increases over 1971 levels, except after individual hearings for each property. The Supreme Court in 1976 declared this first measure unconstitutional in *Birkenfeld, supra,* 17 Cal.3d at page 169, because the individual rental adjustment procedure prevented the Board from making constitutionally necessary adjustments to rent levels without undue delay, which would render such rent levels confiscatory.[2]

Post-*Birkenfeld,* City again enacted a rent control ordinance by initiative in 1980, which as amended in 1982 is the version we consider in the case at bench (ordinance).[3] The ordinance attempted to respond to the constitutional deficiencies noted in *Birkenfeld, supra,* inter alia, by providing an additional, more generalized method of adjusting rent levels upward. Section 11 of the ordinance allows the Board to annually adjust all rent levels for changes in certain expenses, by the process of AGA enactments of general application. The ordinance also retained in section 12 a hearing procedure for consideration of individual landlord petitions for rental increases, for lack of which the ordinance had been found constitutionally insufficient in *Birkenfeld.* As we shall see, post enactment of the ordinance, the focus of City's rent control litigation has shifted to the rent control regulations adopted thereafter by the Board. We shall discuss the provisions of the ordinance in greater detail in part II, *post.*

Subsequently, rent control regulations were adopted by the Board, implementing the ordinance. They established a system for individual rent adjustments (IRA), pursuant to a standard of maintenance of net operating income (MNOI).

---

[2]"Here the charter amendment drastically and unnecessarily restricts the rent control board's power to adjust rents, thereby making inevitable the arbitrary imposition of unreasonably low rent ceilings. It is clear that if the base rent for all controlled units were to remain as the maximum rent for an indefinite period many or most rent ceilings would be or become confiscatory. For such rent ceilings of indefinite duration an adjustment mechanism is constitutionally necessary to provide for changes in circumstances and also provide for the previously mentioned situations in which the base rent cannot reasonably be deemed to reflect general market conditions. The mechanism is sufficient for the required purpose only if it is capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary. . . . The charter amendment is constitutionally deficient in that it withholds powers by which the rent control board could adjust maximum rents without unreasonable delays and instead requires the Board to follow an adjustment procedure which would make such delays inevitable." (*Birkenfeld, supra,* 17 Cal.3d at p. 169.)

[3]The Charter was also then amended to vest control of rental housing policy in City in an *elected* Board. The Board members were theretofore appointed by city council members. (Charter, § 120 et seq.)

The rationale of the MNOI system is generally that confiscation of landlords' property may be avoided, and a fair return on investment guaranteed, if the net operating income from each property is kept constant, through annual increases from the base year, thus compensating for inflation.

In 1983, this court (Division Five) decided *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280 [195 Cal.Rptr. 825] (*Cotati*). The *Cotati* decision upheld a rent control ordinance similar to the one in issue here against an attack for facial unconstitutionality, since "the [rent control] Board has the ability to consider what level of rent will return a reasonable profit to the landlord considering all relevant factors." (P. 294.) We held that local government rent control boards which were constitutionally required to set a fair rate of return for landlords *were not limited to consideration of those specific factors listed in the local ordinance*, but may also consider such relevant factors as the need to set rent levels high enough to maintain the housing stock, the need for an appropriate return on investment in order to attract capital investment, the impact of tax laws and depreciation, the special problems created for landlords by specific types of troublesome tenants, the particular hardship circumstances of the owner, and the effects of inflation on the dollar. (*Id.* at pp. 294-295.)

We also emphasized that, in the absence of an unconstitutional and confiscatory taking, the courts were not authorized to interfere with the actions of the local rent boards, which had been delegated the power to perform this function of setting fair and reasonable levels for rent and rates of return: "While all of the above are factors that may be considered, the extent to which they are considered in setting a fair rent *is within the province of local government, not the courts*." (*Cotati, supra,* 148 Cal.App.3d at p. 296, italics added, fn. omitted.) Our Supreme Court denied review.

The Board heard evidence that, in response to our *Cotati* decision, the local rent board of the City of Cotati in 1985 enacted new regulations under its ordinance which, as City did here, adjusted the MNOI standard by allowing an across the board rise in rent levels to account for the increase in the CPI after the enactment of the ordinance.

One year after our *Cotati* decision, the California Supreme Court approved the principles of the *Cotati* decision in a case challenging City's revised rent control scheme, *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 679-684 [209 Cal.Rptr. 682, 693 P.2d 261] (*Fisher*).

The *Fisher* court also rejected the notion that under the ordinance, the rent board lacked the specifically enumerated ability to grant rent increases for

inflation, so as to avoid an unconstitutional taking: "First, it is not apparent that the ordinance on its face precludes alternative means of adjusting landlords' frozen May 1980 profit amounts." (37 Cal.3d at p. 683, fn. omitted.) Then, in a footnote, the high court referred to section 12 of the ordinance as contemplating just such a result: "For example, nothing in the ordinance precludes the Board from adjusting the rate (percentage) of return on investment in order to increase a landlord's amount of profit. Indeed, the ordinance seems to contemplate ad hoc adjustment of individual landlord[s'] rates of return in order to reach this result: section 12, subdivision (c)(8), provides that in making individual adjustments the Board shall consider '[t]he landlord's rate *of return on investment*.' (Italics added.)" (*Id.* at p. 683, fn. 39, underscored italics added by this court.)[4]

Following the *Fisher* litigation, another suit was brought against the Board, alleging that it had abused its discretion in failing to adopt regulations which would adjust rents upward to allow for a fair return on investment under the MNOI standard. The trial court granted a writ of mandamus ordering the Board to adopt new standards which would meet these constitutional objections. The Board appealed, but later dropped its appeal, and the trial court's ruling became final.

In 1988, this court (Division Five) again visited the issue of rent control in City in *Searle* v. *City of Berkeley Rent Stabilization Bd.* (1988) 197 Cal.App.3d 1251 [243 Cal.Rptr. 449] (*Searle I*). In *Searle I*, we noted that under our prior *Cotati* decision the Board would be required to grant City landlords a "fair return on investment," but declined to reach the issue of entitlement to a retroactive rental increase by landlords who were nonowners when such increase was granted to others because it was not yet ripe for review. (*Searle I*, *supra*, 197 Cal.App.3d at p. 1259.)

The issue did not take long to ripen. In 1990, we again confronted City's rent control controversies in *Searle II*. In *Searle II*, involving the Board's decision on a landlord's individual rate adjustment petition, we ordered the Board to take action to adjust rents upward in order to preserve the value of property under the MNOI method and meet constitutional standards.[5]

We then remanded the matter to the trial court, with directions to grant a writ of mandate ordering the Board to comply "within one year" with our

---

[4]As we will discuss *post*, *Fisher* was careful to observe that its examination of the ordinance was restricted to a determination of its facial constitutionality only.

[5]"To summarize, six years after *Fisher, the Board has yet to adopt a regulation under which landlords can effectively petition for a fair return on their investment.* Four years after *Cotati,* the Board adopted a regulation permitting NOI inflation indexing, but that regulation also is fatally defective. . . . [A]n *even more serious defect of Regulation 1264 is that it provides constitutionally-mandated inflation relief only to those, such as Landlords herein, willing and*

decision, by remedying the constitutional defects noted in *Searle II*. Our Supreme Court denied review, and the unpublished *Searle II* decision became final.

The Board was thus required to comply with the mandate of our *Searle II* decision by developing new regulations which would allow upward adjustments of rent to account for past inflation, allow periodic adjustments for future inflation, and make such adjustments less costly and time-consuming by providing across the board inflation adjustments—rather than requiring landlords to prevail at an individual hearing in order to avoid continued confiscation of their property.

In fact, the Board required the full period of "within one year" from our *Searle II* decision in 1990 to achieve these goals, but did proceed with due diligence to obey our mandate. It hired outside economists with extensive experience in the design of rent control programs to study and present evidence concerning the problems we identified in *Searle II* and to propose solutions to them; based upon the results of this economic analysis and numerous hearings and public meetings, the Board over the succeeding months assembled a formidable administrative record supporting its decisions to enact the regulations in issue here.

The Board was also guided by the decision of the Second District in *Vega* v. *City of West Hollywood* (1990) 223 Cal.App.3d 1342 [273 Cal.Rptr. 243] (*Vega*) (review den.). *Vega* held that a landlord with low rents could not be forever locked into those lower rents by rent control, since "a property owner must be permitted, pursuant to the principles discussed in [*Birkenfeld*], to start rent calculations with a base date rent similar to other comparable properties." (P. 1352.) In so holding, the *Vega* decision required the Board to develop a means by which it could adjust upward the rents of those properties which were far below the level of rents for other comparable properties in the area.[6]

In light of the extensive administrative record generated by the Board, including the expert economic analysis provided by its consultants, the Board enacted the new regulations under attack on this appeal.

---

*able to go through the costly and time-consuming individual petition process. And even for those 'lucky few' it does not provide for ongoing maintenance of net operating income in the face of continuing inflation." (Searle II, supra, A044761, italics added.)*

[6]The *Vega* rents were, thus, established to be below market levels by means of comparison to other similar rental properties, rather than by reference to the HUD standard used by City to define historically low rent.

### B. *Power and Authority of the Board*

The Board's power to set rents is derived from two sources: the literal provisions of the ordinance and the constitutional requirement implied in section 11 of the ordinance by case precedent, including *Searle II* (as City concedes), that landlords receive a just and reasonable return on investment.

Section 6 of the ordinance gives the Board power to "Set rents at fair and equitable levels *in view of and in order to achieve the purposes of this Ordinance.*" (Subd. f(5), italics added.) Section 3's statement of ordinance purpose provides, inter alia, that tenants are to be protected from "*unwarranted* rent increases" and that "*compliance with legal obligations*" in housing rental are to be ensured. (Italics added.)

We affirmed in *Cotati*, *supra*, that although, as here, a rent control ordinance "does not define 'investment' or specify what is 'a fair and reasonable return on . . . investment,'" such language serves as a statement of legislative policy, fixing a primary standard for implementation for which subsidiary rules of executive or administrative bodies, such as Board in this case, may be prescribed and applied. (148 Cal.App.3d at p. 293.)

Under *Birkenfeld's* standards, a rent control provision which does not permit a just and reasonable return on a landlord's investment is confiscatory; and if a rent control measure does not expressly assure the landlord of that fair return on investment, such a condition will be implied. (17 Cal.3d at p. 169.)

Thus, the Board has the power and duty to set rents, but those powers concerning rental adjustments of general application to landlords are not limited to those literally granted by the ordinance in section 11. (See *Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 190-191 [197 Cal.Rptr. 284, 672 P.2d 1297].) The purpose of the ordinance, and the power it invests in the Board, are expanded by the constitutional requirement that the Board provide landlords with a just and reasonable return on investment. The Board's exercise of its discretion in executing its rent setting powers must always be examined for compliance with that requirement standard. The Board exercises, in sum, its discretion and responsibility by setting rents in a fair, nonconfiscatory manner. We may not, in examining the actions it took, presume that it acted "in an arbitrary or capricious manner." (*Cotati*, *supra*, 148 Cal.App.3d at p. 290.) We will examine the Board's actions in this case, to ascertain whether there was an abuse of discretion in setting rents under the ordinance in which this constitutional requirement is present by implication.

### C. *The Administrative Record And Proceedings Before the Board*

The Board hired outside economists with experience in rent control program design to research the issues identified in our prior decisions in *Searle II* and *Cotati*, and to devise and recommend administrative solutions and new regulations to solve those problems. After an extensive review of rent control programs in other California jurisdictions and in other states, as well as economic analyses of the local rental market and the effects of prior regulation in City, the outside economic consultants presented evidence in the form of written reports and testimony on these points. In complying with *Searle II*, the Board also received extensive evidence at the administrative level, in the form of testimony or comments at public hearings. We summarize the most relevant evidence as follows.

#### 1. *Regulations 1100 and 1113—Indexing for Inflation to Protect NOI*

The first issue before the Board and its economic consultants was the indexing of landlords' NOI to avoid slow confiscation by the continued effects of inflation. After an extensive economic and statistical analysis of this issue, the economists concluded that it was necessary to fully index for inflation[7] to preclude resulting confiscation of property by increasing landlords' ratios of operating costs to total rents, thereby reducing, rather than maintaining, the NOI and, over time, depriving the landlords of a fair return on investment. The economists supported this conclusion with technical analyses of the effects of rent control as previously practiced in City, and the history of other jurisdictions which fail to allow full inflation indexing of landlords' income, thereby necessarily eroding the value of landlords' NOI over time.

Competent evidence before the Board showed that under such circumstances the reason for such erosion of NOI is this: Indexing only the nondebt service component of NOI will not permit the purchasing power of the debt service component to keep pace with inflation; NOI is then diminished in relative terms, because debt service increases as a percentage of NOI, thereby reducing a landlord's return on investment. The evidence presented before the Board by a consultant economist further showed this to be so even if it is assumed (contrary to the evidence) that debt service for landlords is constant: "If it is in fact true, as assumed, that the portion of NOI which the landlord must use to pay debt service cannot either grow or shrink, then it

---

[7]This full indexing for inflation of a landlord's NOI provides for inclusion therein of debt service.

must occupy an increasing share of this shrinking NOI. If, as many others assume, debt service has grown on a non-trivial number of properties bought in the last eight years or so [i.e., from 1983 to 1991] when variable-rate mortgages have come into vogue, then debt service has become an even larger share of shrinking NOI."

In light of these facts, the economists concluded: "Put simply, it is a mathematical certainty, not an assertion, that any system which provides for full adjustment to inflationary changes in operating costs and only partial indexing of landlord NOI to general price inflation will, unless operating costs pursue a sustained course opposite to general price trends in the economy, result in erosion of the real value of NOI." The consultants also demonstrated that the ratio of NOI to operating expenses had been falling in City, as it has been in other cities with rent control where NOI was not fully indexed for inflation because debt service was excluded therefrom.

From this economic analysis and similar evidence, the Board concluded that NOI should be fully indexed for inflation, without excluding debt service, believing that action was entirely consistent with the rulings in *Cotati*, *Birkenfeld*, *Fisher*, and our decision in *Searle II* in protecting the real value of NOI from inflationary erosion. The Board did exclude from the indexing formula that portion of the increase in the CPI which was attributable to the costs of shelter and housing. This exclusion of the shelter component from CPI calculations, thereby adjusting for inflation by less than the actual increase in CPI, is not challenged on appeal. Our references to CPI herein likewise exclude that shelter element.

Consequently, the Board amended its regulation 1100 to allow for full indexing of rents for inflation in order to protect NOI, without excluding debt service.[8] The Board also added language in regulation 1113, so as to provide for a one-time retroactive inflation adjustment for the prior years from 1980 to 1990 when no rental increases were allowed therefor.[9] The Board later amended regulation 1264 to provide that a "landlord is entitled to

---

[8]Regulation 1100 as amended provides for AGA to protect landlords' NOI from the adverse effects of inflation. It allows rents, with certain exceptions not here pertinent, to be increased annually by 100 percent of the specified CPI (less its shelter component) for that year, multiplied by the percentage of rent which NOI is estimated to equal for controlled units in general. NOI is defined by regulation 1263 as "gross income" less "property taxes, reasonable maintenance and operating expenses, and the amortized cost of capital improvements." Thus landlords' debt service is *not* deducted from gross income, but is included therein, in determining NOI.

[9]Regulation 1113 is styled an "Inflation Adjustment Order." Its stated purpose, inter alia, is to comply with *Searle II* by restoring to Berkeley landlords, without individual petition and hearing, rental increases to compensate them for inflationary erosion of their NOI.

a fair return" on property and investment, and that this fair return would be calculated based upon a 100 percent adjustment for inflation as measured by the increase in the CPI, less its shelter component.[10]

In order to avoid causing hardship to low income tenants, the Board amended its regulation 1274, section C to allow these rent increases to be phased in over a period of years.

### 2. *The 1980 Rent Basis*

Second, by regulation 1113, the Board also calculated rent increase adjustments based upon rents certified to be accurate in 1980, rather than attempting to extrapolate rents back to 1979. The attempt to overturn this decision by the Board is surprising, because it is difficult to see how the Board can be faulted for not doing something which no party to this appeal suggested it should do, and also because no contrary evidence of any substantiality was placed before the Board to provide a rational basis for taking a different course. The matter was not even raised before the Board; our role is to review the administrative decision in light of the record before the agency, but the agency here was not asked to make the decision which we are now urged to decide.

The Board had previously researched and certified as accurate the 1980 rents which were used as a basis of its calculations. In any event, it appears the amount of the difference to rent adjustments in issue would be quite small, as the trial court observed.

### 3. *Post-1979 Purchasers*

Third, the petitioners in the writ proceeding also contended the Board should have taken action which would exclude purchasers of rental property after 1979 from receiving rental adjustments. There is, however, abundant evidence in the administrative record relative to the question of whether purchasers after 1979 should or should not receive the rent increases every other landlord was getting in order to ensure a fair return on investment. This evidence shows the Board considered the matter and determined that creating an exception for post-1979 purchasers would be inconsistent with the premise of its rent control system, which was based upon protecting net operating income, not upon the date or cost of purchase of the property or its sales history with prior owners.

---

[10]This amendment of regulation 1264 became effective after commencement of this litigation and is not, therefore, challenged on this appeal.

### 4. *Regulation 1262, Section (C)(3)—Comparable Rents*

Fourth, the writ petition also sought to reverse the Board's decision to approve certain rental increases in a hardship category, for upward rent adjustments on those properties which had certain low rents at the time rents were first frozen by City rent control. The Board concluded such an adjustment was required and within the parameters of its discretion in light of *Birkenfeld, supra,* and *Vega, supra,* which required rent boards to allow upward rent adjustments in these circumstances. Accordingly, the Board amended its regulation 1262 to so provide.[11]

### 5. *Regulation 1280—Historically Low Rents*

Fifth, the Board addressed a particular long-standing problem having to do with historically low rents in certain sections of City. In 1987, a City group of minority landlords, the Black Property Owners Association, petitioned the Board to take action on the issue of adjustments in rent levels for those properties which were being rented at below market rates, at the time rent control first went into effect. The evidence before the Board showed "Those [minority property] owners have suffered tremendously. They are locked into historically low rents. [¶] As time goes by their units become less and less profitable. . . . [¶] These owners can not [afford to] maintain their properties. They can not sell their properties. They can not convert the properties to another use." The efforts by minority landlords to obtain adjustments for their historically low rents continued, and the Board hired economic consultants to study the issue, and conducted multiple public hearings.

As a result, the Board ultimately adopted regulation 1280, the historically low rents regulation, to provide relief across the board for certain properties which had very low rents in 1979. The findings in support of regulation 1280 stated, "The purpose of this regulation is to provide prompt and fair adjustments of rents which are well below typical levels because they were significantly below market levels at the inception of rent controls. [¶] . . . The information before the Board shows that those [City] units which were rented at market [rates] in 1979 had rents at or above 75% of the HUD fair market rent for Alameda County; rents below that level were not at market." (Reg. 1280, § (A).)

---

[11]Regulation 1262, section (C)(3) was enacted to permit individual adjustments of base year NOI and corresponding upward rental adjustment on proof that "The base year rent was below prevailing market rents for comparable units in the base year."

### 6. *Summary of the New Regulations*

We will discuss the regulations with more particularity later in this opinion, but in summary the regulations: (1) implement *Birkenfeld, Cotati,* and *Searle II* by adjusting rent levels upward, on a one-time basis, to account for inflation since 1980 when rent control levels were put in place, and to implement those decisions by indexing rents at 100 percent of the rate of increase in the consumer price index less its shelter component, in order to avoid future confiscatory effects due to inflation; (2) use the 1980 rents previously certified as accurate in order to calculate these adjustments; (3) allow rent adjustments to all landlords, including those who purchased properties after 1979; (4) address the problem identified in *Birkenfeld* and *Vega,* of rents which are far below the level of comparable properties, by adjusting upward those rents; and (5) also implement the standards of reasonableness and fairness formulated in *Birkenfeld* and the subsequent case law, by allowing upward adjustment of historically low rents.

We turn next to a brief summary of the tortuous procedural history of this litigation.

### D. *Procedural History of This Litigation*

A petition for a writ of mandate was filed by a tenants' group in the Alameda County Superior Court during July 1991, seeking to overturn certain of the Board's actions. City also filed a complaint seeking to overturn the Board's actions that are in issue on this appeal.

On November 1, 1991, Judge Parrilli denied the request by the petitioners for a preliminary injunction overturning certain of the Board's actions. Petitioners again sought a preliminary injunction, contending the regulations in issue here were invalid, before Judge Bartalini, who also denied the request. The petitioners then again sought injunctive relief before Judge Bartalini, who recused himself and was replaced by Judge Carson. After the matter was briefed before Judge Carson, the petitioners challenged Judge Carson under Code of Civil Procedure section 170.6, so the matter had to be transferred to its fourth judge in as many months, Judge Sutter.

After extensive argument in May 1992, Judge Sutter issued a well-written statement of decision which upheld the Board's regulations in issue here against almost all the challenges mounted by the petitioners. The only matter as to which the trial court issued a writ of mandate overturning the Board concerned the application of rent adjustments to purchasers of rental property after 1979. Judgment was entered in September 1992.

A City landlords' group, the Berkeley Property Owners' Association, which had joined the proceedings below, filed a timely appeal from that portion of the trial court's decision which rejected the Board's grant of inflation adjustments to post-1979 purchasers of property. City filed a timely cross-appeal on the other issues, and we have granted leave to the Board and certain amici curiae to file briefs. Following oral argument of this matter, we vacated submission to conduct additional research on the complex legal issues presented in connection with those arguments of counsel.

The remedial actions taken by the Board having been essentially mandated by prior case law dating back to *Birkenfeld*, by our prior *Searle II* decision, and by the intervening *Vega* decision, it is somewhat surprising to find them again subject to challenge—this time not by the Board itself, but by City which contends the Board exceeded its authority and prejudicially abused its discretion in the way in which it set about complying with these prior judicial mandates. Nevertheless, we will proceed to the merits of the appeal, on the theory that City has standing to challenge administrative actions which were taken by an agency, allegedly in violation of statutory standards. (See *Californians for Native Salmon etc. Assn. v. Dept. of Forestry* (1990) 221 Cal.App.3d 1419, 1428 [271 Cal.Rptr. 270].)

## II. DISCUSSION

The Board did not abuse its discretion or exceed its authority in enacting the regulations in issue here.

### A. *Inflation Adjustment Issues*

■ The Board's decision to annually index rents fully for inflation is not reversible as a prejudicial abuse of discretion, despite City's numerous arguments to the contrary. ■ The Board has *discretion* in setting rents which provide a fair return on investment to the landlord, as the City concedes in principle but fails to concede to the Board in practice. The premise of *Birkenfeld*, and all the other prior opinions by California courts in this area, is that rent control cannot be allowed to result in a slow unconstitutional taking through the combined effects of inflation and regulatory delay in adjusting rents to reasonable levels; City cites no California case, and we have found none, which holds a constitutionally required inflation adjustment mandated to a board operating a rent control system, based upon the maintenance of landlords' net operating income from their property, may not include the component of rents which represents the landlords' debt service. ■ The Board's decision was well within its proper authority and discretion, and indeed was required by the internal dynamics and logical

foundations of the City rent control system itself, as well as the prior decisions of our Supreme Court and the Courts of Appeal.

We begin with a brief chronological review of the case law relevant to this particular issue of the proper scope of inflation indexing in a rent control system.

In *Birkenfeld, supra,* our Supreme Court held that a rent control system is only constitutional when it contains a mechanism for adjusting rents across the board which will avoid the confiscatory effects of inflation on rents frozen by regulations. (See fn. 2, *ante,* p. 958.) Such a system may not unnecessarily restrict a rent control board's power to adjust rents. (*Birkenfeld, supra,* 17 Cal.3d at p. 169.)

We elaborated upon this *Birkenfeld* principle in *Cotati, supra,* where we observed that a constitutional rent control system must allow the local rent board to make timely general adjustments to rent levels, not long-delayed adjustments after contested individual hearings for each separate property: "[I]nherent in the *Birkenfeld* due process standard of 'a just and reasonable return on their property' is the assurance that an efficient landlord may recover all reasonable expenses actually incurred and, in addition, *receive a fair profit or return on investment.* [Citation.] A failure in this regard might well violate prohibitions against the taking of private property for public use without just compensation contained in the Fifth Amendment to the United States Constitution and article I, section 19, of the California Constitution. An unspoken purpose of rent control during inflationary times is to distribute the burdens of inflation fairly between the landlord and tenant. It should be recognized in inflationary periods that the landlord's investment was made with dollars that were worth more at the time of the investment and therefore may deserve a greater present return. If the net operating profit of a landlord continues to be the identical number of dollars, there is in time a real diminution to the landlord which eventually becomes confiscatory." (148 Cal.App.3d at p. 293, italics added.)

In *Searle II,* we overturned prior actions of a previous Board which had limited inflation indexing for net operating income to only an "arbitrary" percentage of inflation, 40 percent of the increase in the CPI; and which required individual petitions, rather than general adjustments, by each landlord in order to obtain adjustments for net operating income.

City now concedes in its brief that the Board has the power to avoid unconstitutional results by granting uniform general rental adjustments under

section 11 of the ordinance, i.e., "landlords' profits [fair return on investment] [must] be allowed to keep up with inflation."

City's former Board delayed for years in executing its duty to provide landlords with the fair return on their investment which the Supreme Court and this court have repeatedly held to be constitutionally mandated. In the same vein, City now urges that the Board lacked the authority to grant general adjustments, under section 11 of its ordinance, for the universal impact of inflation in eroding the purchasing power of the debt service component of a landlord's NOI.

We first note that debt service adjustments are not forbidden by section 11 of the ordinance, and that the other considerations specifically listed in section 11 of the ordinance are not defined so as to exclude the power of a board to adjust them. The literal provisions of the ordinance certainly do not forbid the result reached by the Board here, which treats debt service consistently with the impact of inflation on all other components of NOI which the Board is required to consider.

Further, as we said in *Searle II*, "What reason is there for an individual petition system [section 12 of the ordinance] to adjust for the universal impact of inflation?" We ask here, what reason exists procedurally, as City implicitly argues, to separate contributing causes of inflation's universal impact on a landlord's fair return, so that some such causes are to be redressed only through the individual petition system and some are to be redressed by across the board adjustments of general application. The answer to *Searle II*'s question and to ours is the same—none.

City and the dissent argue *Fisher*'s holding that the ordinance was *facially* constitutional, coupled with its language ("section 11 provides for annual rent adjustment, but precludes the Board from granting such city wide rent adjustment except to offset certain increases in general costs" (37 Cal.3d at p. 679, fn. 32), stamps its proposal with the imprimatur of the Supreme Court. They misapprehend the reach of *Fisher*: "We must stress . . . the limited scope of our inquiry in facial challenges . . . . As we made clear in *Birkenfeld, whether rental regulations are fair or confiscatory depends ultimately on the result reached.*" (P. 679, italics added; accord, *Cotati, supra,* 148 Cal.App.3d at pp. 290-291 ["Facial validity, in short, is concerned more with excessive restriction than with comprehensiveness of regulation."].)

Here we deal, instead, with the Board's power and discretion to interpret and apply its governing ordinance, including the constitutional mandate the courts have implied therein to provide landlords with a fair return on

investment. Section 11 of the ordinance gives the Board the authority to grant general formulized rent adjustments. Case law of long standing establishes the Board need not follow any particular formula in calculating such adjustments, and its use of a standard designed to protect against the loss of landlords' NOI is legally valid. (See *Fisher, supra,* 37 Cal.3d at p. 680; *Baker* v. *City of Santa Monica* (1986) 181 Cal.App.3d 972, 976, 988 [226 Cal.Rptr. 755].) City and our dissenting colleague, while conceding the Board's action was required to protect NOI against erosion under its constitutional mandate, argue the Board went too far and could have only protected landlords against inflation by indexing for their "profit"—which City would apparently define as NOI minus debt service. They reach this conclusion, inter alia, by pointing to the fact that our Supreme Court in *Fisher* sometimes used the terms "profit" or "net return" without always explicitly defining these terms in a legal or scientific sense. (37 Cal.3d at pp. 682-683 & fns. 36-39.) They suggest the Board should have used City's definition of "profit" (which nowhere appears in the ordinance) as excluding debt service from the AGA formula, and that the Board erred in protecting landlords' NOI, rather than merely protecting City's proposed truncated definition of "profit."

However, the circumstances of the facial validity challenge in *Fisher* did not require the high court to address this precise issue of the inclusion of debt service in NOI, and the high court did not do so. Nothing in *Fisher* or any other case supports City's argument that the Board was legally required to *exclude* from its AGA formula the effect of inflation on debt service because of the provisions of the ordinance. Similarly, nothing in our prior *Searle II* decision supports the City's argument. There we explicitly noted that the issue of debt service was not before us, while observing that the Board in power *at that time* apparently did not yet include debt service when calculating its AGA formula. No case holds, and we reject the contention that, the inclusion of debt service as an element of the estimated percentage of rent which comprises NOI for purposes of an AGA formula, whether by decision or regulation of a future board, is forbidden by the literal terms of section 11 of the ordinance or by the constitutional requirement implied in that section of providing a fair return on investment to landlords.[12] We also analyzed the legal issue throughout *Searle II* as one in which the Board was required to protect landlords' NOI, not merely some rump fragment of

---

[12]We take judicial notice of the present regulations of the Board, which explicitly define NOI as including debt service. Regulation 1263 provides that NOI is the sum remaining to landlords when certain expenses are subtracted from gross rents; debt service is not subtracted from NOI and is, thus, included within it.

"profit" as City suggests.[13] Finally, we reversed as arbitrary and potentially confiscatory the previous Board's decision to only index for about 40 percent of the effect of inflation, which is essentially the same result sought by City here, through excluding the effect of inflation on debt service.

In sum, it is undisputed that the sole authority in City to set and adjust rents, in compliance with the constitutional mandate implied in its ordinance to ensure landlords a fair return on investment, is that of the Board. The Board has a concomitant duty to promulgate regulations to accomplish those ends.[14] Further, since neither the state or federal Constitution nor any state or federal statute prohibits or preempts the regulations under attack (see *Fisher*, *supra*, 37 Cal.3d at pp. 677-678), any limitation on the Board's discretionary powers must come from the ordinance. We find no ordinance language or provision prohibiting the subject regulations; and nothing in the ordinance assists or guides the Board in determining a fair return on investment.[15]

The legal issue to which we turn here is simply whether the Board abused its discretion in including debt service in its AGA formula. In doing so, we do not perceive we finally determine this issue, as the dissent suggests we must, solely from the perspective of a duty "to prevent[] the [Board] from exceeding the narrow authority granted by the ordinance." (Conc. and dis. opn., *post*, at p. 989.) We have determined the ordinance does not per se proscribe the regulations the Board has adopted. We, instead, will examine the Board's action to decide whether *on the record before us* it properly performed its constitutional and conceded duty to establish and ensure a fair return on investment to landlords through its adopted regulations.

The Board here determined on substantial and competent evidence that if it indexed rents for AGA purposes by a formula based only on the costs specified in section 11, and excluded therefrom the landlord's debt service as part of his NOI, the result reached would be confiscatory.

The result the Board reached was fair and eliminated confiscatory practices of long standing. It did not abuse its discretion in concluding on

---

[13]Our colleague Justice King seemingly characterized "fair profit or return on investment" as synonymous in *Cotati*, *supra*, 148 Cal.App.3d at page 293.

[14]As the dissent concedes, "It is the Board's responsibility to determine what constitutes a fair return on [the landlords'] investment." (Conc. and dis. opn., *post*, p. 997, fn. 8.)

[15]The Board's regulation 1264, establishing criteria for determining fair return on investment, was adopted subsequent to this litigation.

competent evidence that the universal impact of inflation eroded the purchasing power of a landlord's debt service, and that the general adjustments it made to rent ceilings should be based on a formula which included debt service as part of a landlord's NOI. City's position that consideration of rental increases to adjust for inflation should be procedurally split, so that inflationary losses produced generally by erosion of the purchasing power of the debt service component of a landlord's NOI must always be subjected to the individual petition process of section 12 of the ordinance and excluded from any AGA formula promulgated by the Board under section 11, must be rejected. Its adoption would once again simply fit City's landlords into the same type of procedural straitjacket they have been forced to wear for years, which was long ago found constitutionally deficient in *Birkenfeld* and in *Searle II*.[16]

We also note that two more decisions by this district have been published which specifically addressed analogous debt service issues under their respective ordinances. In *Anderson* v. *San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1347 [237 Cal.Rptr. 894] (*Anderson*), Division Two upheld a decision of the San Francisco rent board to allow rent increases which passed through to tenants the full effect of debt service previously incurred, in light of a rehabilitation assistance program offering loans to landlords to fix substandard properties: "We hold that the rent board correctly allowed the pass-through and that the superior court, in concluding otherwise, improperly interpreted the ordinance. We further hold that the [San Francisco] ordinance and its enabling statute simply do not authorize the exclusion of preexisting debt service . . . ." Division Two noted that it would probably not be practical to exclude debt service from consideration in calculating the need for rent increases, since otherwise landlords would not procure loans and financing in order to rehabilitate properties and make them habitable for tenants. (*Ibid.*)

---

[16]We must also reject City's "windfall" argument adopted by the dissent, running essentially as follows: The Board's regulations for generally calculating a landlord's AGA are based on a formula which includes a compensatory element for the universal inflationary impact eroding the purchasing powers of the landlord's debt service as part of his NOI. City argues a windfall is thus reaped by the landlord whose rental units require no debt service or fixed debt service.

However, any AGA of rents, universally applied, may, in individual cases, produce both windfalls and shortfalls. Logical extension of this windfall argument seemingly requires that all general rental adjustments be proscribed, because their application might produce some disparate results among landlords, e.g., an across the board AGA for increases in landlords' maintenace and operating expenses will be more than some landlords spend and less than is spent by others. Such a result would not only contravene the literal language of the ordinance, but again relegate landlords to the individual petition procedure to obtain inflationary relief with the consequent delay found unconstitutional in *Birkenfeld*.

More recently, in *Cole* v. *City of Oakland Residential Rent Arbitration Bd.* (1992) 3 Cal.App.4th 693, 700 [4 Cal.Rptr.2d 593] (*Cole*), Division Two upheld the decision of the Oakland rent board to consider debt service costs when determining the property owners' gross income, for purposes of calculating an upward rental adjustment for rental units, despite the complaints of tenants that the rent board was thereby allowing the property owners to raise rents excessively: "In order to be constitutionally valid, rent control legislation must permit landlords to earn a ' "just and reasonable" ' rate of return on their investment [citations], i.e., one high enough to encourage good management, reward efficiency, discourage the flight of capital, and enable operators to maintain their credit. [Citation.] The fact that permissible rent increases as to petitioning tenants . . . may ultimately result in a landlord realizing a net return rather than a negative cash flow does not render the Board's construction of section 10.4.1 [the regulation allowing debt service costs to be considered in calculating gross income and passed through to tenants] unreasonable."[17]

There is, thus, an unbroken line of precedent stretching from *Birkenfeld* through *Cotati*, *Fisher*, the *Searle* decisions, *Anderson*, and *Cole*. These cases have recognized that the proper purpose of rent control, as limited by constitutional standards, is to allow local rent boards to set rent levels at fair and reasonable levels—which protect the value of property owners' investments in their property from confiscation by maintaining their net operating income against the continual and progressive ravages of inflation. As our local rent boards and courts have become more sophisticated in their economic analyses, and as the continued existence of rent control systems for decades has forced boards and courts to view the consequences of their actions in the long term rather than as a matter of temporary emergency or mere political expediency, a consensus has begun to emerge that the fuller and more timely protection of property owners' NOI should be provided—which necessarily requires indexing for debt service, since debt service is by definition a determinant of operating income.

---

[17]Further, as Division Two observed in *Cole*, these highly technical and detailed issues of the appropriateness of particular rental increase formulas for debt service are (in the absence of constitutional questions) better decided by the local rent boards, not the courts: "Our courts have ruled time and again that rent control agencies are not obliged to fix rents by application of any particular method or formula. [Citations.] As in other methods of rent calculations, 'a court "may compel [an] agency to act, but it may not substitute its discretion for the discretion properly vested in the administrative agency . . . 'Courts should let administrative boards and officers work out their problems with as little judicial interference as possible . . . .' " ' [Citations.]" (3 Cal.App.4th at p. 700.)

In the case at bar, the Board made exactly this determination.[18]

The economists hired by the Board were not alone in their opinion that fully indexing for inflation, including the debt service component, is necessary because the failure to do so will inevitably lead to the slow erosion of net operating income. Even City, which on appeal opposes this full indexing, concedes in its reply brief on appeal that a failure to fully index for inflation by excluding the debt service component will cause the real value of NOI to fall: "It is true that if only the profit portion of NOI keeps up with inflation, the 'real' value of the debt service portion of NOI will not keep up with inflation, and therefore the entire NOI will not keep up with inflation." However, City argues that the slow destruction of NOI by this method is acceptable, because all property owners' debt service costs are necessarily fixed in actual dollars and they may make their debt service payments with deflated dollars. Therefore, City suggests, the falling real value of NOI will not adversely affect landlords.

The Board, however, acted within its discretion when it rejected this argument. First, as the Board determined, a purpose of the City rent control system is to maintain, not destroy, the NOI of landlords in real terms. It would surely be strange if this system purportedly designed to maintain the real value of NOI were used instead concededly to erode it. Second, as the economic analyses and evidence before the Board showed, debt service and financing costs are not always fixed; the availability of variable rate loans causes debt service costs to rise with interest rates, which generally move in tandem with inflation rates. Third, the system of full and uniform indexing for AGA adopted by the Board has the advantage of neutrality as to the nature of the property owner's financing arrangements; it need not distinguish between properties owned free and clear, those encumbered by large recent mortgages, or those in between.[19]

The trial court rightly accorded the agency in question here, the Board, the deference we generally permit to an administrative agency: "Neither *Fisher*, *Searle II* [n]or any other case cited mandates any particular formula to

[18]The economists also pointed out that after our *Cotati* decision, the City of Cotati fully indexed for inflation, including debt service, in order to enact a constitutional and manageable rent control system in compliance with our prior mandate.

[19]Moreover, as the *Anderson* and *Cole* cases observed, the failure to provide appropriate mechanisms by which debt service costs may be passed on in rents will lead to untoward effects in the long term, by destroying the property owner's incentive and ability to maintain and rehabilitate property. This failure to preserve the property, of course, results in the deterioration of the housing stock and ultimately defeats the legitimate goals of rent control. (See *Cotati, supra,* 148 Cal.App.3d at p. 295.)

determine what is a fair return on investment. . . . [¶] Since the ordinance specifically states that it is not to be applied so as to prohibit the granting of a 'fair return on investment' without defining that term, the Board surely has some discretion in determining the proper interpretation and implementation of that language."[20]

The issue here in part concerns the proper respective roles of administrative agencies and the courts. While the rules and particular circumstances at issue in *Anderson* and *Cole* doubtless differed somewhat from the precise question presented by the City scheme at issue here, the point which does not differ is that such issues, which implicate the interpretation of technical economic data and the application of the principles of the rent control system to specific circumstances, are within the direct competence of the local rent boards, not the courts. ▇▇▇ "We must therefore defer to the Board's interpretation . . . unless we find such construction to be arbitrary, capricious or without a reasonable or rational basis. [Citations.]" (*Cole, supra,* 3 Cal.App.4th at p. 698.) "Our courts have ruled time and again that rent control agencies are not obliged to fix rents by application of any particular method or formula." (*Id.* at p. 700.) Where as here the result is not confiscatory or unconstitutional, the courts " ' "should let administrative boards and officers work out their problems with as little judicial interference as possible . . . ." ' " (*Vega, supra,* 223 Cal.App.3d at p. 1352, quoting *Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4].)

▇▇▇ Our conclusion in this respect is also consistent with language in the recent decision of the Second District, *Kavanau* v. *Santa Monica Rent Control Bd.* (1993) 19 Cal.App.4th 730 [23 Cal.Rptr.2d 724] (*Kavanau*). There, the court observed in dicta, in the context of a Santa Monica rent ordinance which allows indexing for inflation, but expressly excludes debt service from the inflation adjustment, "We are not asked on this appeal to decide whether the MNOI properly excludes from consideration a landlord's debt service. We note, however, that we can't accept the Board's overly broad assertion that *this expense is properly excluded 'because payments towards debt service build equity and therefore benefit the owner.' 'Debt service' includes interest, not just principal and, at a minimum, debt service is a factor which appears relevant to the determination whether, in fact, a*

---

[20]As the trial court correctly observed in ruling on this issue, "Plaintiffs point to a 1982 study showing that landlords spent 58 percent of NOI on mortgage payments, and they argue that this 58 percent must be disregarded in adjusting NOI for inflation. In effect, they claim that the allowable NOI increase should be limited to about the same amount, around 40 percent, which the court in Searle II found to be unlawful." And as the trial court also correctly perceived, "No authority supports plaintiffs' argument."

*landlord is receiving a fair return.*" (*Id.* at p. 733, fn. 3, italics added.) We agree with this dicta and note that if it is "at a minimum" questionable whether the wholesale exclusion of debt service is constitutional, as this dicta suggests, then it cannot be an abuse of discretion for the Board to decide to fully index for inflation in order to avoid the likelihood of a successful constitutional challenge. Like the *Kavanau* court, we are not called upon to actually decide whether the Board could have legally decided to *exclude* debt service; we need only observe that it acted legally when it decided to *include* it.

The Charter, in section 123, and the ordinance, in section 6, subdivision f(5), specifically granted to the Board, not City or a court, "the power to determine, to arbitrate and to set rent levels, whether through general or individual adjustments, of any unit . . . ." (Charter, § 123); and the power to "Set rents at fair and equitable levels in view of and in order to achieve the purposes of this Ordinance" (Ord., § 6, subd. f(5)). We cannot say this broad grant of power and discretion to set rents at fair, equitable, and constitutional levels was abused by the Board in this instance. (See *Cole, supra,* 3 Cal.App.4th at p. 700; cf. *Abramson* v. *City of West Hollywood* (1992) 7 Cal.App.4th 1121, 1128 [9 Cal.Rptr.2d 507] (*Abramson*) [A rent board's construction of its rent ordinance is entitled to "great deference."];[21] cf. also *Black Property Owners Assn.* v. *City of Berkeley* (1994) 22 Cal.App.4th 974, 983 [28 Cal.Rptr.2d 305] [A litigant's "disagreement with that legislative determination [regarding the advisability of rent control regulations] does not provide a basis for judicial invalidation . . . ."].)
Indeed, we have previously held that it "is to be presumed" that a local rent board did not act arbitrarily in making general rent adjustments. (*Cotati, supra,* 148 Cal.App.3d at p. 290.) It is the burden of City to overcome this presumption by demonstrating an abuse of discretion, and City has not done so here. (See *Cole, supra,* 3 Cal.App.4th at p. 700.)

Finally, we note that after the full inflation adjustments, including the debt service component, City rents will still be the lowest in the central Bay Area, and will be below those of any neighboring cities; after adjustment, those rents will remain fair and equitable to tenants, while ensuring landlords that the real value of their NOI will not be destroyed by future unconstitutional confiscation in the guise of price regulation. The trial court

---

[21]City's reliance on one portion of the *Abramson* decision is also misplaced. The *Abramson* decision granted "great deference" to a local rent board decision, yet found the ordinance in question required larger rent increases than the local board had allowed. (7 Cal.App.4th at pp. 1128-1129.) Here we must grant "great deference" to the Board's conclusion that its own ordinance allowed it to include the debt service component in its rental adjustments—a decision which is consistent with the Board's duty under the ordinance and case law.

correctly ruled the Board's determination to index fully for inflation, including a debt service component, was not subject to reversal under the applicable legal standards. (See *Cole, supra,* 3 Cal.App.4th at p. 700.)

B. *The 1980 Rents Issue*

 Next, City contends the Board erred when it chose to calculate rents based upon rent levels previously certified as accurate for each unit at the time of the survey, the 1980 rents, rather than researching or extrapolating backward to the 1979 rents in order to create a basis for calculation. According to City, if the Board had used City's approach, it would have ultimately raised rents by 1.5 percent less than it did.

We are not ready to announce a new principle of administrative law, that the courts are free to correct what they perceive to be administrative mistakes without giving due allowance for the discretion of the agency— especially where, as here, the purported error was never objected to or called to the attention of the agency, and is essentially de minimis in any event. We decline City's invitation to micromanage the operations of local rent boards.

In deciding the 1980 rents issue, the trial court stated, "It does not appear that this issue was raised before the Board." We find nothing in the record before us to the contrary. The trial court proceeded to validate the Board's determination to thus use the 1980 rents for its calculation.

We would not, in any event, reverse the Board's determination as an abuse of discretion because, as the trial court also observed, "One reason the [B]oard gives for using 1980 data is administrative convenience: 1980 data is more reliable and complete [than] its 1979 data." We cannot find an abuse of discretion in using more reliable and complete data; one would think it would be an abuse of discretion *not* to do so.

City suggested belatedly to the trial court that the data problems in the 1979 rents could have been solved by a method of extrapolation; i.e., any missing rent data for a particular unit in 1979 could have been reconstructed by starting with the certified 1980 rents, and then reducing them by about 5 percent, the amount of the rent increase granted by the Board between the years 1979 and 1980.

This method apparently is at variance with the fact that many landlords actually did not impose the 5 percent rent increase which the Board granted as to 1979-1980 rents. As the trial court observed, "The temporary ordinance in effect in 1979 generally permitted owners to increase rents 5 percent.

Plaintiffs assume that owners increased their rents that much leading to their 1.5 percent conclusion. Although most owners *could have* taken advantage of the 5 percent allowable increase, it does not follow [that] most of them in fact did so. The Board's records indicate that for the 10,798 units for which they have 1979 records [about half the total], only 1200 units experienced a rent increase of 5 percent from 1979 to 1980. The majority of units had the same rent, or even a lower rent in 1980 [than they had] in 1979. [Citation.] To the extent there was any average rent increase, it was, therefore, considerably less than plaintiffs assume."

The trial court concluded, "[T]he Board's discretion was broad enough and the amount at issue small enough to authorize its use of 1980 base rents."

We agree with the trial court. The issue may not be raised for the first time before a court without presenting the question first to the Board, and in any event no abuse of discretion was shown. (See *Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794]; *Cole, supra,* 3 Cal.App.4th at p. 700.)

### C. *Post-1979 Purchasers*

 Next, City contends the Board abused its discretion when it granted rent adjustments to all landlords, without excluding post-1979 landlord purchasers. It argues such purchasers bought with full knowledge of the oppressive nature of rent control, receiving bargain prices as a result; and would garner a forbidden "windfall" if such purchasers received a rental increase sufficient to guarantee a "fair return on investment" under the provisions of the ordinance by means of inflation adjustments to rent levels after 1979. The trial court partially agreed with City on this one point. We, however, do not find any prejudicial abuse of discretion by the Board.

The administrative record shows the issue of post-1979 purchasers was raised before the Board by City's counsel as follows: "What about landlords who have purchased since 1979? The price presumably took the rents into account. There is no need for retroactive rent increases for such owners."

A number of objections were raised, however, to City's proposal that post-1979 purchasers be excluded from the rent adjustments designed to allow a fair return. As one consultant noted, "If we are intending to prevent the windfall gain from accruing to the buyers, should we then compensate the sellers for their windfall loss?" It was also observed that such a proposal would cause rents to vary from unit to unit based upon a mere fortuity, the

sale and purchase of the unit during the period in question: "Implementing this suggestion would lead to similar rental units having differing rents." Moreover, it was suggested that City's proposal was inconsistent with the fact that the sellers of a property grant all their rights in the property to the buyers: "Owners under [City's] rent control system buy all entitlements. For example, buying owners receive entitlements to increased rents because of capital improvements performed by old owners. Buying owners relied on the fact that the Ordinance promised a fair return."[22]

As the testimony presented to the Board indicated, "New owners buy all entitlements as well as all liabilities with the property when they purchase[] it. If the former owner, for example, failed to pay his Rent Board [registration] fees, the new owner would have to pay them. If the old owner let the property run down, the new owner would have more work to do. If an old owner did capital improvements, the new owner is entitled to the rent increases following from those capital improvements. If the old owner in the pre-*Searle* [*II*] environment didn't receive indexing benefits, the new owner in the post-*Searle* [*II*] environment does deserve those indexing benefits. He bought them along with the property. In buying the property, the new owner bought the entitlement to full indexing just the way he buys the entitlement to reimbursement for capital improvements done by the former owner."

The Board declined to create such an exception to rent adjustment entitlement for purchasers after 1979. This was consistent with the City rent control system in effect since 1980, which was property specific, not owner specific, and had never before made a distinction between landlords based upon the date of acquisition for other purposes, such as arrears in rental registration fees, capital improvement pass-throughs, and the like; and with the decision to use a system based upon NOI from the property, rather than total return to each individual owner. As we have earlier observed, it was for the Board, not the courts, to regulate rents by either general or individual

---

[22]In addition, the following observations were presented to the Board: "In fact, in the entire time of [City's] rent control, no such distinction between an original owner and a later acquiring owner has been made. Capital improvements done by a previous owner can be passed through by an acquiring owner. The former inflation index of 40% of the CPI never distinguished between original and subsequent owners. In fact, the theory has been that an acquiring owner gets all the benefits and, just as importantly, all the liabilities, of the former owner." It was argued that property owners had bought with the expectation that rents would be adjusted for inflation as *Birkenfeld* had required, and that all properties had suffered equally under rent control, regardless of when they had been acquired by the current owner.

adjustments under the Charter and the ordinance and applicable case law which grant this power to the Board.[23]

While the City assails this Board's decision as a "windfall" for landlords, that is the language of political rhetoric, not economic or legal analysis. One might as well say, as some landlord representatives did, that a contrary ruling by the Board would result in a "windfall" to tenants, or that previous sellers should be paid the amount of the rental adjustment by the present tenants of the property in order to avoid the "windfall." Certainly it would have been illogical for the Board to first find that certain rent levels were reasonable, and yet roll back those rent levels, as the City urges, for certain properties based upon what is a mere fortuity from the standpoint of the tenant, a change in ownership of the property. The Board acted within its discretion, and reasonably, when it determined that rental adjustments designed to provide a fair return and to prevent deterioration of the housing stock should follow the property, not the owner. (See *Cole, supra*, 3 Cal.App.4th at p. 700.)

The City cites no published case, nor have we found one in our independent research, which holds a local rent board abuses its discretion when it enacts a measure such as this one. We are concerned here also with a rule of property which implicates the need to respect the settled expectations of property acquirers, as well as their right to acquire (absent lawful notice to the contrary) the full rights to the property held by the previous owner. (See, e.g., *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 833-834, fn. 2 [97 L.Ed.2d 677, 687, 107 S.Ct. 3141] [The federal Supreme Court held, in reversing a California administrative agency's land use regulation, that "the prior owners must be understood to have transferred their full property rights in conveying the lot [which was subject to regulation]."].) Never had City previously looked to the identity or circumstances of the owners, rather than the property itself, in regulating rents. Persons who acquired property in City, therefore, reasonably relied on the fact that their constitutional rights would not be violated, and that rental adjustments necessary to protect the NOI from the property would be granted in the future; we perceive no abuse of the Board's wide discretion. (See *Cotati, supra*, 148 Cal.App.3d at p. 296 ["While all of the above are factors that may be considered, the extent to which they are considered in setting a fair rent is within the province of local government, not of the courts." (Fn. omitted.)].)

---

[23]The Board and other rent control agencies "are not obliged to fix rents by application of any particular method or formula." (*Cole, supra*, 3 Cal.App.4th at p. 700.) Instead, the courts " ' "should let administrative boards and officers work out their problems with as little judicial interference as possible . . . ." ' " (*Vega, supra*, 223 Cal.App.3d at p. 1352.)

The Board's action respects these elementary rules of law regarding property, achieves simplicity, and avoids unnecessary complications and disputes concerning the date of purchase or the nature of the ownership interests of the respective owners over time. It is also consistent with the principle that the acquirer of property receives the full rights to the property held by the owner, and this action was well within the discretion of the independent Board to determine rent levels at fair and reasonable rates. (See *Cole, supra,* 3 Cal.App.4th at p. 700.)

We reject the City's suggestion throughout this litigation that the Board could not achieve such results by general adjustments for all properties under section 11, and could only proceed under section 12 to hold what would potentially be thousands of separate individual hearings before granting such relief to each property purchaser after 1979 who demonstrated a need for it. Both section 123 of the Charter and the rent ordinance itself, properly construed, grant plenary power to the Board to set rent levels by general or individual adjustments. Moreover, the delay and waste of resources inherent in using the individual hearings process to decide what is, in fact, an issue of general import to post-1979 purchasers amply justified the Board's action. *Birkenfeld, Fisher,* and *Cotati* all recognized a rent board must have that power to enact general rent adjustments in order to avoid unconstitutional delays in adjusting rent levels, and must be allowed to consider all the relevant factors in making those adjustments, under the principle that rent ordinances will be so construed as to achieve their constitutionality, if possible. We merely reach a result here which is consistent with the principle that the Board's mandate to raise rents by general adjustments was judicially imposed in order to remedy the constitutional deficiency which *Birkenfeld* found in the absence of the express granting by ordinance of such power to the Board. (17 Cal.3d at p. 169; see also *Cotati, supra,* 148 Cal.App.3d at p. 294.)

We find no abuse of the Board's discretion in allowing a fair return on investment to post-1979 purchasers by receipt of rent adjustments.

### D. *The Comparable Rents Regulation*

Next, City asserts the Board erred when it enacted a regulation allowing individual rent level adjustments for those properties which had abnormally low rents at the time rents were frozen by rent control in 1980, when compared to similar properties which were renting at market levels at that time.

The Board concluded such an adjustment mechanism was required by two previous Supreme Court and Court of Appeal decisions which required rent

boards to allow upward rent adjustments in these circumstances, *Birkenfeld*, *supra*, and *Vega*, *supra*. Accordingly, the Board amended its regulation 1262 to so provide. The trial court ruled this regulation valid, but (consistent with its ruling as to post-1979 purchasers) ruled it should not be applied to those who purchased property after 1979. However, this action by the Board was well within its discretion and power to correct the problem of low rents; for the reason stated in the preceding section and for the reasons which follow, we uphold the Board's authority and exercise of its discretion to enact this regulation and make it applicable to *all* persons who own property with an abnormally low base-year rent.

Relative to this point, our Supreme Court in *Birkenfeld* held that the prior City rent control system was constitutionally invalid, because it imposed a freeze on rent increases without any ready procedure of adjusting those rents to reflect unusual market conditions prevailing as to those particular units. (17 Cal.3d at p. 169.)

Relying upon the language of *Birkenfeld*, *supra*, the Second District in *Vega*, *supra*, 223 Cal.App.3d at page 1352, held that an owner must be allowed a rent level adjustment if the base rent frozen by the inception of rent control was much lower than the rents charged for other comparable rental units.

The Board properly implemented the decisions in *Birkenfeld* and *Vega* by providing a means by which the rents for certain units, which were below those of comparable properties, could be adjusted upward. (See *Birkenfeld*, *supra*, 17 Cal.3d at p. 169.) As enacted, the comparable rents regulation (regulation 1262) now provides in section (C): "The base year net operating income and current lawful rent ceiling shall be adjusted by the Board if . . . : [¶] . . . [¶] (3) The base year rent was below prevailing market rents for comparable units in the base year. Comparability of units shall be judged based on the number of bedrooms, neighborhood, services, amenities provided, and other relevant factors." We perceive no abuse of discretion in the adoption of this regulation, which essentially implements *Birkenfeld* and *Vega*.

The Board properly exercised its discretion by providing the base year adjustment mechanism for comparable rents. (See *Cole*, *supra*, 3 Cal.App.4th at p. 700.)

E. *Historically Low Rents*

The final regulation adopted by the Board concerned the special problem of historically low rents on certain units. Once again, we find the Board did not err.

The Board adopted regulation 1280, the historically low rents regulation, to provide individual rental adjustments for certain properties which had very low rents in 1979. The findings in support of regulation 1280 stated, "The purpose of this regulation is to provide prompt and fair adjustments of rents which are well below typical levels because they were significantly below market levels at the inception of rent controls. [¶] . . . The information before the Board shows that those [City] units which were rented at market [rates] in 1979 had rents at or above 75% of the HUD fair market rent for Alameda County; rents below that level were not at market." (Reg. 1280, § (A).)

Regulation 1280 simply allows owners of certain units with rents, which met this standard of very low rents at the inception of rent control, to petition for an individual rental adjustment on that basis. Once again, the trial court upheld the regulation but forbade its application to post-1979 purchasers. Once again, we find no abuse of discretion by the Board in allowing all property owners with these very low rents—below 75 percent of the level certified as reasonable by the federal government—to raise their rents to reasonable (but still low) levels through the IRA process. The lower court erred in so restricting the application of regulation 1280.

We need only repeat our observation that the Charter and the ordinance in question give the Board the power to grant individual rent adjustments to landlords through the IRA process. The adjustments in question here were within the discretion of the Board since they were designed to allow correction of a particular hardship situation, attendant upon the enactment of rent control at permanently frozen levels. Certain properties in City, as of the date of the enactment, had unreasonably low rents. We decline to interfere with the Board's discretion to strike a balance between the landlords' rights to receive a fair return, and the tenants' legitimate desire for rents which are low, but not so unreasonably low as to lead to undue hardship to landlords, with consequent loss of the incentive to maintain rental property. There was no abuse of discretion under the applicable legal standards. (See *Cole, supra,* 3 Cal.App.4th at p. 700.)

F. *Conclusion*

The judicial response to over two decades of City's rent control controversies has consistently established these principles: Rent control schemes are unconstitutional if they deprive a landlord of a fair return on his investment; that condition if not present in an ordinance will be implied therein; and whether rental regulations are fair or (unconstitutionally) confiscatory is determined by the result they produce. The Board in adopting the

regulations involved in this case was obligated to determine if the result it reached was nonconfiscatory; the Board did not abuse its discretion in determining a nonconfiscatory result was reached in calculating AGA by including debt service as a component of NOI.

The Board also, on competent and substantial evidence, determined that the AGA formula it adopted by regulation 1100, the one-time retroactive inflationary adjustment it adopted by regulation 1113, its comparable rents regulation 1262, section (C)(3), and its historically low rents regulation 1280 were all necessary to eliminate long continued unreasonable delay in terminating confiscatory rental rates in City and in providing a just and reasonable return on investment to City's landlords. We conclude that the Board thereby properly exercised its discretionary authority in accordance with the constitutional mandates imposed on it by the courts of this state, including this court; and did not by adopting those regulations abuse its discretion by exceeding the powers granted by its enabling ordinance which was subject to those judicial mandates.

Our colleague Justice King agrees with our conclusions as to many of the major issues in this appeal, which are thus unanimous. We all agree in upholding the power of the Board to grant a one-time increase in rent levels and subsequent yearly increases—however they may be calculated—to restore and protect the rights of property owners in City, especially in light of the previous history of confiscation through inflation which was allowed by prior Boards. We also unanimously agree the Board can use the 1980 rent levels as the basis for its inflation calculations, even though another year might also have been chosen by the Board, in its discretion. Finally, we are also unanimous in concluding the trial court erred when it ordered the Board to exclude more recent acquirers of property from these remedial provisions.

However, our dissenting colleague still differs with the Board on a few remaining points. First, the dissent suggests the Board should have chosen differently in the methodology and details of its indexing model dealing with debt service, as defined by the Board's actions and regulations in issue here. Moreover, the dissent differs from the Board as to the wisdom of issuing two new regulations which redefine the Board's preexisting powers to grant individual rent adjustments, under section 12 of the ordinance, where rents were frozen at unduly low levels when rent control was first put into place—the comparable rents and historically low rents regulations. However, in attacking the Board for enacting these regulations, the dissent still comprehends only an incomplete view of the Board's proper role and authority in determining the regulatory details of such issues, in its discretion.

The dissent further relies on dictionary definitions which do not prove that such definitions define a fair rate of return under the ordinance. Those snatches of definitions, moreover, do not quite prove the claim that a definition of profit used in common parlance requires the Board to adjust for inflation or treat debt service in any particular way. In fact, despite the dissent's misreading of the case law, the applicable precedents (especially the *Birkenfeld, Fisher,* and *Kavanau* decisions) support the Board's determination that debt service may properly be included within rent level adjustment formulas in order to achieve a fair and constitutional result.

More critically, the dissent's resort to dictionary definitions, and other indirect indications such as examples given for purposes of illustration in footnotes, only highlights the crucial fact that neither the case law mischaracterized by the dissent, nor the ordinance, purports to offer binding definitions or precise guidance to the Board—the Board was required to supply its own. In particular, the term "fair return" is not defined or capable of definition in any more precise or mathematical way. The Board is, thus, required to fill up the details of fair rent regulation in practice, by taking regulatory actions and promulgating regulations—which is exactly what we previously told the Board to do, and exactly what it did on remand.

As at least one group of experts on rent control regulations recently held, " 'In enacting such rules and regulations, the Board is empowered to fill up the details of the enabling legislation.' " (*Da Vinci Group* v. *San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24, 29-30 [6 Cal.Rptr.2d 461], quoting *Fox* v. *San Francisco Residential Rent etc. Bd.* (1985) 169 Cal.App.3d 651, 656 [215 Cal.Rptr. 565].) It simply cannot be true that when a rent board interprets its enabling ordinance through regulations which favor tenants, as in *Da Vinci, supra,* we are bound to defer to its expertise; but when the Board tries to strike a fair balance here between the right of tenants and landlords, we cannot accord it the very same deference. Sauce for the goose is sauce for the gander.

Heedless of this principle, the dissent also attacks the Board for promulgating the comparable rents regulation—which by definition only allows an individual, not a general, rental adjustment for a particular property where rents were frozen at unduly low levels on the date rent control began. This mechanism to adjust individual rents is entirely consistent with the *Birkenfeld, Fisher,* and *Vega* decisions. Further, despite the dissent's reliance on a capitalized section heading from an opinion by the Second District, Division Two (conc. and dis. opn., *post,* at p. 1001), the decision in question in fact held a rent regulation was constitutionally defective because it *lacked* safeguards similar to the ones provided by the Board here (*Apartment Assn. of*

*Greater L.A.* v. *Santa Monica Rent Control Bd.* (1994) 24 Cal.App.4th 1730, 1739 [30 Cal.Rptr.2d 228]). Nor is there any support in the record for the claim—which the dissent adopts from City's brief—that this individualized, property-specific remedial provision, which may require a property owner to research rents on comparable properties dating back over a decade, will lead to major rent increases, raise all rents to the former median level, or in any way affect more than a few exceptional properties. In any event, even under the dissent's own truncated interpretation of the governing ordinance, the Board had the power to enact this regulation.

Similarly, the historically low rents regulation provides only an individual, not a general, adjustment process for exceptional properties renting far below market levels. It is a safe harbor provision which, when contrasted with the complicated evidentiary showing required for relief under the comparable rents regulation, provides constitutional and fair rent level adjustments on a timely and readily ascertainable basis. The dissent also observes that since this provision was sought by a particular group of minority landlords (although it would apply to all similarly situated persons) its enactment is "profoundly troubling." (Conc. and dis. opn., *post*, at p. 1003, fn. 14.) The Board, however, was only doing its job when it listened and responded to the serious concerns raised about the bureaucratic maze of its regulations and the delays in its hearing procedures.

Moreover, it is also worthy of emphasis here that the Board has recognized its legal and moral duty to provide a fair rate of return to landlords, while avoiding sudden or unfairly large rent increases to tenants. Hardship provisions for tenants permeate the regulations and protect the legitimate interests of tenants on low or fixed incomes. Rents in City remain remarkably low. The result is fair to tenants and landlords.

Our differences with our dissenting colleague over these remaining details should not take undue precedence, since we have reached consensus and unanimity on many of the major issues before us. The net effect of our decision will be to return to rent boards the task of interpreting and shaping the regulatory details of the rent control process, and to reserve the judicial power to those interventions necessary to achieve a constitutional and legal result.

III. Disposition

The ruling of the trial court is affirmed in all respects, except for its ruling that the regulations in issue are inapplicable to post-1979 landlord purchasers. The latter ruling is reversed. The matter is remanded to the trial court,

with instructions to issue a judgment denying the petition for writ of mandate in its entirety. Costs on appeal are awarded to the Board and to Berkeley Property Owners' Association.

HANING, J.— ██ ██ ██ ██ ██ ██ ██ ██ ██
██ Although I fully concur in Justice Peterson's opinion, I write separately to emphasize the fundamental principles upon which my concurrence rests. First, as Justice Peterson states, it is undisputed that the sole authority in Berkeley to set and adjust rents, to ensure a fair return on investment in compliance with its constitutional mandate (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644 [209 Cal.Rptr. 682, 693 P.2d 261]), and to promulgate regulations to accomplish those ends resides within the rent stabilization board (the Board). Second, since neither the state or federal Constitution nor any federal or state statute prohibits or preempts the regulations under attack (*id.*, at p. 680), any limitation on the Board's discretionary power must come from the rent control ordinance itself. I do not find any language in the ordinance that specifically prohibits the subject regulations. In fact, there is nothing in the ordinance that assists or guides the Board in establishing or determining a fair return on investment except in regulation 1264, which was promulgated subsequent to the litigation herein and consequently not directly at issue in this case.

As Justice King notes in his dissent, the ordinance is designed to protect tenants against "unwarranted" rent increases and "arbitrary, discriminatory, or retaliatory evictions." There are no evictions at issue in this action; none of the parties are tenants claiming unlawful or retaliatory eviction, or landlords seeking to evict tenants. As for "unwarranted" rent increases, the dissent fails to give adequate consideration to the fact that the Board is also constitutionally required to ensure a fair return on investment. The Board spent a substantial amount of time studying this problem, retained various outside economists and experts to assist it, conducted public hearings before promulgating its regulations, and the record contains ample evidentiary support for the Board's actions.

The opponents of the Board's regulations attempt to portray all Berkeley landlords as rapacious developers draining the life blood from the poor and the underprivileged. This simply is not the case. Based on our long history with this ongoing litigation, we know that many tenants are middle-class professionals on their way up the economic ladder, and are climbing a little faster than their contemporaries in other communities because of their ability to take advantage of Berkeley's lower rents. Many landlords are elderly, retired and minority property owners renting out small units in the attempt to

make a living that their Social Security incomes cannot alone provide. The Board's obligation in setting reasonable rents and ensuring a fair return on investment is to balance the interests of the *entire* community. It has done so in a fashion to avoid the undue delay found unconstitutional in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 169 [130 Cal.Rptr. 465, 550 P.2d 1001]. No party to this proceeding has suggested that individual cases of hardship or overreaching cannot or will not be addressed under the regulations. Consequently, I see no "unwarranted" rent increases, nor any other action by the Board that constitutes an abuse of its discretion under the ordinance.

The litigation over this ordinance commenced sometime shortly after an amendment to the Berkeley Charter in 1972—nearly a quarter of a century ago. Whatever the intent of the drafters, it was not that the courts establish the rents for each rental unit in the City of Berkeley—that task is clearly entrusted to the discretion of the Board. (See *Aguirre* v. *Lee* (1993) 20 Cal.App.4th 1646, 1652-1653 [25 Cal.Rptr.2d 367].) However, if every act of fine tuning the regulations to adjust to changing economic conditions prompts another legal challenge, this litigation will never end. In making this observation I am not advocating an affirmance of the Board's action for the mere sake of expediency or economy. I simply believe that the Board's action is constitutional, within its discretion and that interference by the courts is not warranted. (*Ibid.*)

**KING, J.**—Although I concur in parts of the majority opinion, I respectfully but most vigorously dissent from other parts. The author of the lead opinion obviously does not believe, despite our Supreme Court's interpretation of clear limiting language in the very ordinance before us, that its purpose is to control rents.

It may well be that the City of Berkeley's ordinance should be amended to take into account cases decided since its enactment and current rent control thinking, but that is for the citizens of Berkeley to decide, not this court. Our duty is limited to preventing the Berkeley Rent Stabilization Board (the Board) from exceeding the narrow authority granted by the ordinance. The lead opinion fails to carry out that duty, holding in effect that the Board may adopt regulations which disregard its primary statutory obligation to control rents. It consistently ignores the fact that, as interpreted by the Supreme Court, the ordinance limits annual general rent increases to amounts reflecting the universal effect of inflation on certain specified expenses and on profits, and authorizes no other rent increases unless a landlord, by individual petition, demonstrates that he or she is not receiving a fair return on investment.

I concur in the majority's holding that the Board has properly granted a one-time increase in rents by indexing for inflation which has occurred since the adoption of the ordinance in 1979, but my concurrence is only to the extent that this is applied to the portion of net operating income (NOI) not used for debt service. I also agree, but with the same limitation, that future annual general adjustments (AGA's) of rent should take into account the effects of inflation on NOI. This is required by *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644 [209 Cal.Rptr. 682, 693 P.2d 261], and by the decision I authored for this court in *Searle* v. *City of Berkeley Rent Stabilization Board* (Cal.App.) (*Searle II*). However, I would hold the Board acted in excess of the authority it is granted by the ordinance in also applying this one-time and annual inflation index to that portion of NOI used for debt service, because landlords with fixed-rate mortgages pay the same monthly debt service throughout the life of the mortgage, regardless of inflation. Additionally, for those Berkeley landlords with no debt service at all, the increase the majority upholds is also a complete windfall unrelated to fair return on investment.

I concur with the majority's approval of the Board's use of 1980 rents as the base rents, although there really is no reason why the actual rents charged at the time rent control was imposed in 1979 could not have been used. I also reluctantly concur with the majority's approval of granting the entire one-time rent increase for inflation since 1979 to all landlords, including those who purchased their property after that time, and who thus get a rent increase reflecting prepurchase inflation.

I wholeheartedly dissent from the majority's conclusion that the Board possesses the authority to adopt regulations which grant automatic increases in rent (1) to the one-half of all Berkeley landlords whose 1979 rents were below the median rent for comparable units, and (2) to those landlords whose 1979 rents were under 75 percent of the Department of Housing and Urban Development (HUD) rent levels (which the Board automatically increases to the 75 percent level). Both these regulations, on their face, require a landlord to petition for an individual rent adjustment (IRA) which, under section 12 of the ordinance, may be granted only if it is necessary in order to provide the landlord with a fair return on investment. Yet these two regulations, the so-called "comparable rents" and "historical low rents" regulations, provide for automatic rent increases upon the mere filing of an IRA petition, thereby eliminating the ordinance's compulsory showing that such an increase is necessary to provide the landlord with a fair return.

Therefore, I would hold the trial court erred in upholding regulations 1100 and 1113 to the extent they inflation-index the debt service portion of NOI, and regulations 1262(C)(3) (comparable rents) and 1280 (historically low rents). My dissent arises from a fundamental disagreement with the lead opinion's general approach as well as with its reading of both the ordinance and the relevant case law.

## I.

The issue before us is not, as the lead opinion repeatedly asserts, whether the Board abused its discretion in enacting the challenged regulations, but whether under an ordinance which *limits the Board's power to increase rents* it exceeded its authority by enacting them. In reviewing the legislative acts of an administrative agency the court asks "first, did the agency act within the scope of its delegated authority." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31].) "In order for a regulation to be valid, it must be (1) consistent with and not in conflict with the enabling statute and (2) reasonably necessary to effectuate the purpose of the statute. . . . [¶] In other words, the rulemaking authority of an agency is circumscribed by the substantive provisions of the law governing the agency." (*Physicians & Surgeons Laboratories, Inc.* v. *Department of Health Services* (1992) 6 Cal.App.4th 968, 982 [8 Cal.Rptr.2d 565], citations omitted.) "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)

Our first duty, therefore, is to determine whether the Board exercised its quasi-legislative authority within the bounds of the ordinance. That issue "comes within our respectful but nondeferential standard of review." (*Henning* v. *Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 758 [268 Cal.Rptr. 476].) "While the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to great weight, nevertheless . . . final responsibility for the interpretation of the law rests with the courts.' . . . " (*Morris* v. *Williams, supra,* 67 Cal.2d at p. 748, citation omitted.)

In this instance, the meaning of the enabling legislation is not in dispute, although the relevant provisions are set out in somewhat truncated form in the lead opinion. Section 3 of the ordinance states in its entirety, "The

purposes of this Chapter are *to regulate residential rent increases* in the City of Berkeley and *to protect tenants from unwarranted rent increases* and arbitrary, discriminatory, or retaliatory evictions, in order to help maintain the diversity of the Berkeley community and to ensure compliance with legal obligations relating to the rental of housing. This legislation is designed to address the City of Berkeley's housing crisis, preserve the public peace, health and safety, and *advance the housing policies of the City with regard to low and fixed income persons, minoritie s, students, handicapped, and the aged.*" (Italics added.)

Section 6, subdivision (f), enumerates the powers and duties of the Board, which include adjusting base rent ceilings "in accordance with Sections 11 and 12." As summarized in *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at page 653,[1] "Section 10 establishes base rent ceilings that landlords may not exceed except as permitted by the Board under sections 11 and 12. Section 11 provides for annual general adjustment (AGA) of rent ceilings to cover increases or decreases relating to utilities and taxes. In making such general adjustment, the Board is given authority to adopt a general formula based on available data relating to such expenses. If a landlord is not satisfied with this general increase, he may petition the Board for an individual rental adjustment (IRA) under section 12. In ruling on this petition the Board must consider many nonexclusive factors, including a landlord's individual costs, but in no event may it deny a rent increase needed to allow a landlord a 'fair return on investment.' " (Fn. omitted.)

The lead opinion not only ignores *Fisher*'s apt description of the ordinance's limitation on the Board's authority under section 12 to adopt regulations assuring landlords a fair return on investment in response to individual petitions, but also completely rewrites section 11 to give the Board power it is not granted by the ordinance. This ordinance severely restricts the power granted to the Board to increase rents. Unless the limitations on the Board's power violate the Constitution, this court must enforce them. The majority refuses to do so.

---

[1]*Fisher* is not only the lead case on the very ordinance under which the challenged regulations were enacted, but also the first Supreme Court case to establish an inflation-indexing requirement of constitutional dimension. *Fisher* should be our guide in this appeal. It is therefore curious that the majority gives this landmark decision short shrift compared to *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001], which concerned neither this ordinance nor the issue of inflation-indexing. Perhaps this is because the lead opinion is completely inconsistent with the Supreme's Court's decision in *Fisher*.

## II.

As the lead opinion notes, the Supreme Court had invalidated an earlier Berkeley ordinance which contained no mechanism for adjusting rent ceilings without confiscatory delay. Specifically, the previous ordinance did not allow the Board to "order general rental adjustments for all or any class of rental units based on generally applicable factors such as property taxes." (*Birkenfeld* v. *City of Berkeley*, *supra*, 17 Cal.3d at p. 171, fn. omitted.) "However, the exact mechanism found wanting in 1976 is present in the ordinance before us now in section 11—a comprehensive scheme that provides for annual across the board adjustment based on 'cost' factors." (*Fisher* v. *City of Berkeley*, *supra*, 37 Cal.3d at pp. 687-688, fns. omitted.) "This is, in essence, a variation on the so-called 'maintenance of net operating income,' or 'cost passthrough' approach." (*Id.* at p. 679, fn. 32.)

Maintenance of net operating income is a commonly used formula for implementing the fair return on investment standard approved in *Fisher*. (See 37 Cal.3d at pp. 679-686.) Net operating income is defined as gross income less "property taxes, reasonable maintenance and operating expenses, and the amortized cost of capital improvements (pursuant to Section 1267)." (Reg. 1263.)[2] Debt service, as the lead opinion notes, is not one of the enumerated operating expenses; it is presumed the landlord pays the mortgage out of net operating income, the remainder of which, perforce, is the landlord's "profit."

For the first time anywhere, the lead opinion challenges the use of long-established rent control terminology. NOI minus debt service is not merely "City's definition of 'profit' " (lead opn., *ante*, p. 971), but the definition that all parties in the interminable litigation over Berkeley rent control, including all parties to this appeal and seven amici curiae, have used for at least 15 years. It comports with the dictionary definition, "the excess of returns over expenditure" (Webster's New Collegiate Dict. (9th ed. 1984) p. 939) as well as with the plain meaning: Profit is what remains after payment of all expenses of the property, to be used as the landlord wishes, usually for personal goods and services. It is because inflation raises the cost of these goods and services, that profits must be inflation-indexed in order to avoid confiscation, as discussed in *Searle II*.

---

[2]Since section 12, subdivision (c)(3), of the ordinance, as implemented by regulation 1267, provides for rent increases by individual petition to pass through to tenants the cost of capital improvements necessary to maintain habitability, the author of the lead opinion worries needlessly that less than full inflation-indexing through the AGA process will discourage landlords from completing needed repairs, or result in deteriorating rental housing stock.

It must also be remembered that originally, "maintenance"[3] of NOI did not mean, as the lead opinion appears to believe, maintenance of the real value of NOI through annual increases to compensate for inflation. On the contrary, it meant exactly what it says: the exact dollar amount of base year net operating income indefinitely maintained. In response to the *Birkenfeld* court's rejection of Berkeley's attempt to freeze rents indefinitely, section 11 of the new ordinance "provides for annual rent adjustment, but *precludes the Board from granting such citywide rent adjustment except to offset certain increases in general costs*." (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 679, fn. 32, italics added.) Debt service was not included among those costs that could be expected to rise annually for every landlord at about the same rate, but was considered a part of NOI which was to remain fixed.[4] The lead opinion not only ignores, but contravenes, the specific statutory limitations on the power of the Board.

The *Fisher* court warned that NOI could not remain fixed forever either. Because of the effect of inflation, although the ordinance might "properly *restrict* landlords' profits on their rental investments, it may not indefinitely *freeze* the dollar amount of those profits without eventually causing confiscatory results." (37 Cal.3d at p. 683, italics in original, citing *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 293 [195 Cal.Rptr. 825].) As the court explained, "if the fixed amount of a landlord's profit remains the same year after year his return will in time diminish in real value: it is obvious that a $1,000 'profit' in 1990 will have a much lower value than the same dollar amount of profit in 1980." (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 683.) Thus *Fisher* required the annual general adjustment to include consideration of not just the enumerated expenses, but also the effect of inflation on profits, in order to assure continued fair return on investment.

It is not, as the lead opinion suggests, through oversight or imprecision that the discussion in *Fisher* is framed entirely in terms of the effect of inflation on profits, rather than NOI. (37 Cal.3d at pp. 682-684; see also *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362, 368-372 [190 Cal.Rptr. 866], upholding a "maintenance of profit" or "fair operating income" approach.) That is the way the plaintiffs presented the issue because they and everyone else involved understood that "profits" meant the portion of NOI remaining after payment of debt service.

---

[3]"Maintenance" means "the act of maintaining." To "maintain" is "to keep in an existing state." (Webster's, *op. cit. supra,* at p. 718.)

[4]The lead opinion's "note that debt service adjustments are not forbidden by section 11 of the ordinance, and that the other considerations specifically listed [there] are not defined so as to exclude the power of a board to adjust them" (lead opn., *ante,* p. 970) is thus incorrect.

It also makes sense, for while a given number of dollars would not buy in 1984 the same goods and services as it did in 1979, in most cases it would still pay the mortgage. The price of goods and services on which profits may be spent rises as a result of inflation; payments on fixed-rate mortgages do not.

It is true, as the lead opinion points out, that in *Searle II* we discussed adjustment of NOI, not profits, for inflation. That is because we were reviewing a regulation which purported to index NOI, not profits, for inflation. Neither party suggested, nor did we consider, that partial inflation-indexing might be justified by the distinction between the profit and debt service portions of NOI. We held in *Searle II* that on the record before us an inflation index of 40 percent of the consumer price index (CPI) was arbitrary precisely because the Board had offered no rational basis for its choice. This does not mean, as the lead opinion suggests, that there could never be a rational basis for that choice. For example, the City of Santa Monica indexes NOI at 40 percent of the annual CPI increase, based on studies indicating that 60 percent or more of its owners' base year NOI went to long-term fixed-rate debt service. Thus, in Santa Monica, 40 percent indexing of base year NOI is tantamount to 100 percent indexing of base year profits.

We also held in *Searle II* that there was no rational basis for relegating adjustments for the universal impact of inflation on all landlords to the individual petition system. What reason exists then, the lead opinion asks, for treating the portion of NOI which goes to pay debt service differently from "all other components of NOI," i.e., profits? The answer is obvious: They are not similarly affected by inflation.

For the vast majority of landlords paying off long-term fixed-rate mort-gages,[5] inflation has no impact whatever on the purchasing power of that portion of NOI which goes toward debt service. It is true, as the lead opinion observes, that debt service and financing costs are not fixed for every landlord,[6] but it does not follow that they are subject to "the universal impact of inflation" (*Searle II, supra,* A044761), that is, that all landlords' debt

---

[5]The record does not disclose the percentage of mortgages on Berkeley residential rental properties that are fixed as opposed to adjustable rate. We can assume the vast majority are fixed rates and thus for the entire life of the 20- or 30-year mortgage, the monthly payment remains the same although paid with inflated dollars. For example, if the mortgage payment for the first month is $1,000, every payment for the life of the mortgage is $1,000, not an amount increased by inflation. Of course, as each payment is made, an increased portion of it is applied to principal, increasing the landlord's investment in the property.

[6]It is not true, on the other hand, that, in the lead opinion's words, "City argues that . . . all property owners' debt service costs are necessarily fixed in actual dollars." (Lead opn., *ante*, p. 975.) That would be as foolish as suggesting, as the lead opinion, again incorrectly,

service is uniformly affected by inflation. Some landlords choose to finance their properties through other than long-term fixed-rate mortgages, e.g., adjustable-rate mortgages. Some may have refinanced or bought rental property during periods of high interest rates, while others purchased or refinanced during mortgage rates' recent descent to the lowest levels in two decades, and of course, some landlords have no mortgage at all. These are very personal decisions, involving various levels of risk, just as when one is financing a home. They are based on innumerable very personal factors, psychological as well as economic; each decision, each choice, is an integral part of an entirely individual financial plan. Some landlords, for example, may refinance rental property in order to obtain funds for investment elsewhere. Even if this involves a variable-rate mortgage, there is no reason a tenant should have to finance the increased costs of a landlord's personal investments. Even if, as the lead opinion suggests, mortgage rates "generally move in tandem with inflation rates" (lead opn., *ante*, p. 975) (which has certainly not been the case in recent years), these individual choices cannot trigger a constitutional entitlement to annual general rent increases—available as well to landlords with no debt service at all because they have paid off their mortgages or received rental property through gift or inheritance—based on fluctuations in the consumer price index.

The lead opinion places great emphasis on the fact that the Board acted on the basis of "expert" evidence of "outside economists" (lead opn., *ante*, pp. 956, 961, 963). The author of the lead opinion does not name these experts, but presumably refers to the consulting firm of Hamilton, Rabinowitz & Altschuler (HR&A). Whatever the nature and extent of its experience "in the design of rent control programs" (lead opn., *ante*, p. 961), HR&A expressly eschewed any legal expertise, telling the Board it was not a law firm and "does not purport to offer professional legal opinions or assessments." Thus the Board's consultants, by their own admission and contrary to the lead opinion's assertion, could not and did not render advice on what was necessary to provide a "fair return" or avoid "confiscation."

The experts did testify to the following more or less self-evident mathematical facts: given a scheme in which rent is composed of operating expenses plus net operating income, and net operating income is composed of debt service plus profits, if you inflation-index operating expenses and profits but not debt service, the result will be (1) the ratios among the

says the City has, that ". . . the falling real value of NOI will not adversely affect landlords." (Lead opn., *ante*, p. 975.) To the extent it is successful in controlling rents, all rent control adversely affects landlords to some degree. *Fisher* recognized and approved this effect as long as the ordinance, as in section 12, has a mechanism for a landlord to petition to assure a fair return on investment.

various components will change, and (2) net operating income and therefore rents will not keep pace with inflation. This in turn slows down the appreciation rate of rental properties. The *Fisher* court recognized and approved this "antispeculation" effect. (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at pp. 691-692.) Neither rents, nor NOI, nor property values actually "shrink," as the lead opinion suggests, but they do increase more slowly than they would without rent control. This is one of the reasons for adopting rent control.

If, as a matter of policy, the Board wants rents to keep up with inflation, and property to appreciate quickly, the expert testimony indubitably provides a rational basis for 100 percent inflation-indexing, including debt service. It is not arbitrary, capricious or otherwise prohibited by the Constitution. But neither is it required by the Constitution or permitted by the ordinance. *Fisher* established the constitutionality of Berkeley's maintenance of net operating income system for guaranteeing landlords a fair return on investment, except insofar as it indefinitely froze the dollar amount of profits in the face of constant inflation. *Fisher* and its progeny do not require maintenance of the original ratio among, or "real dollar" value of, all the elements in the formula. If they did, confiscation would have begun with the very first AGA, which adjusted only that portion of rent revenues dedicated to operating expenses. The Constitution does not guarantee a certain ratio among the elements in a rent control formula, nor rents that keep pace with inflation, nor a certain rate of property appreciation. It guarantees a fair return on investment. As the Board admitted in its reply brief, even a decline in property value does not necessarily deny a landlord a fair return.[7]

We have come, full circle, back to the intersection of the ordinance and the Constitution. To recapitulate: the Board is bound by its ordinance. The ordinance grants power to make annual general rent adjustments in section 11. Section 11 allows AGA's only to cover increases in specified costs. The Constitution requires that landlords receive a fair return on their investment. The *Fisher* court said freezing profits would eventually be confiscatory, but section 12's fair return guarantee provided a sufficient adjustment mechanism to save the ordinance's facial constitutionality. In *Searle II,* we said section 12's individual petition process was not sufficient to adjust rents for the universal and uniform impact of inflation, because it is both irrational and likely to lead to confiscatory delay.[8] Thus, as the lead opinion notes, the AGA power expressly granted to the Board in section 11 has been "expanded by the constitutional requirement" (lead opn., *ante,* p. 962) of inflation

---

[7]Thus, it is not entirely accurate to say, as the lead opinion does, that in *Searle II* we ordered the Board to take action "in order to preserve the value of property." (Lead opn., *ante,* p. 960.)

[8]We also said in *Searle II* that Berkeley's fair return regulation (then Reg. 1275) remained constitutionally inadequate in that it failed to furnish specific guidelines enabling landlords to

indexing to guarantee a fair return. This is true, however, only to the extent that the individual petition process in section 12 is constitutionally insufficient. As we found in *Searle II*, the IRA process is constitutionally insufficient when a universal threat to fair return, here inflation, affects all landlords every year to the same extent. As has been shown, this can be said of the profit but not of the debt service portion of NOI, as held by the lead opinion.

Thus, the Board exceeded its authority under the ordinance in enacting regulations 1100 and 1113 to the extent they provide for across-the-board inflation indexing of that portion of net operating income which, on average, is dedicated to debt service. To the extent the Board interpreted its ordinance otherwise, its interpretation is "clearly erroneous or unauthorized" (*Anderson v. San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1343 [237 Cal.Rptr. 894]; *Cole v. City of Oakland Residential Rent Arbitration Bd.* (1992) 3 Cal.App.4th 693, 698 [4 Cal.Rptr.2d 593]).

Neither of the above two cases addresses, contrary to the lead opinion's suggestion, "analogous debt service issues" (Lead opn., *ante*, p. 973). For starters, the lead opinion does not assert, nor could it, that either the San Francisco or the Oakland rent control law is as stringent as Berkeley's. Oakland's ordinance, for example, "allows landlords to impose a rental increase where there is an increase in debt service" (*Cole v. City of Oakland Residential Rent Arbitration Bd.*, *supra*, 3 Cal.App.4th at p. 695), while Berkeley's does not (Ord. § 12, subds. (d) & (e); *Fisher v. City of Berkeley*, *supra*, 37 Cal.3d at pp. 691-692). At cited page in *Anderson*, the court held the San Francisco ordinance did not authorize exclusion of preexisting debt service "from the term 'monthly loan payments' ([San Francisco Admin. Code] 32.73, subd. (a))." (*Anderson v. San Francisco Rent Stabilization & Arbitration Bd.*, *supra*, 192 Cal.App.3d at p. 1347.) The quoted phrase (lead opn., *ante*, p. 973), inexplicably replaced by an elipsis in the lead opinion, undermines any applicability *Anderson* might have to this case. The "sole

---

understand the burden they must bear to obtain relief and the benefits to be expected if they succeed. "It does not say," we noted, "what fair return on a landlord's investment is, nor provide a formula for determining it." (*Searle II*, *supra*, A044761.) Regulation 1264 now states that fair return will "ordinarily" be measured by maintenance of inflation-indexed base year NOI. But it still does not say how fair return will be measured extraordinarily, that is, in those cases where a landlord contends his or her inflation-indexed base year NOI (even adjusted as the regulations allow) does not provide a fair return on investment. It is the Board's responsibility to determine what constitutes a fair return on investment. Courts should only become involved if the exercise of that discretion is abused by a return falling outside broad legal parameters. In other words, it is the responsibility of the Board to determine what constitutes a fair return on investment so that landlords can ascertain whether to file for an IRA.

issue" presented in *Cole* was "the propriety of the Board's method of computing gross income under [Oakland City Council Ordinance No. 9980] section 10.14.1" (*Cole v. City of Oakland Residential Rent Arbitration Bd.*, *supra*, 3 Cal.App.4th at p. 697), the source of the "formula for allowing permissible rent increases based on increased debt service costs" (*id.* at p. 696). Neither of these cases is remotely on point.

The dictum in *Kavanau v. Santa Monica Rent Control Bd.* (1993) 19 Cal.App.4th 730, 733, footnote 3 [23 Cal.Rptr.2d 724], with which the lead opinion agrees ("at a minimum," debt service is a factor relevant to fair return determination) (lead opn., *ante*, p. 977) has, of course, no precedential value, especially as it appears to conflict with the *Fisher* court's express approval of Berkeley's two " 'antispeculation' clauses" which explicitly exclude increased debt service as a factor in individual fair return analysis in most cases. (*Fisher v. City of Berkeley*, *supra*, 37 Cal.3d at pp. 691-692.)

### III.

The lead opinion also concludes, virtually without analysis, that the Board did not abuse its discretion in enacting the comparable rent and historically low rent regulations,[9] largely "for the reason stated in the preceding section." (Lead opn., *ante*, p. 983.) But these regulations have an entirely different source, and are based on an entirely different rationale from the inflation-indexing regulations. They provide for individual rather than general rent adjustments, and are designed to implement section 12's guarantee of a fair return on investment, although as will be seen, as written they grant automatic rent increases without considering whether the landlord is already receiving a fair return.

It will be recalled that Berkeley's maintenance of NOI system is based on the net operating income produced by rents in the base year, usually 1979. (Reg. 1264.) Since base year rents were set in an unregulated market, base year NOI is presumed to have provided landlords with a fair return on their investment in the base year. Regulation 1262, as originally enacted, permitted individual adjustment of base year NOI upon an administrative determination that, contrary to the express presumption, base year NOI had not provided a fair return on a particular landlord's investment in the base year. Factors that might be considered in making such a determination included "the fact that the rent was exceptionally high or low, due to a family or

---

[9]The lead opinion refers to these regulations as applying to "very low rents" (lead opn., *ante*, p. 984), "abnormally low rents" (lead opn., *ante*, p. 982), rents "far below the rents of comparable units" (lead opn., *ante*, p. 957), and rents "in a hardship category." (lead opn., *ante*, p. 966.) As will be seen, both regulations define the covered units rather specifically; neither uses any of the rhetorical but imprecise formulations adopted by the lead opinion, nor does the record before us demonstrate these characterizations are correct.

*special relationship* between the landlord and tenant, or other factors." (Italics added.)

As amended in 1987, the regulation permitted individual adjustment of base year NOI upon an administrative determination that it was "exceptionally high or low" for either of two reasons, one of which was the "special relationship" factor reworded to cover any situation in which "the rent was not established in an arms-length transaction or was otherwise not set under market conditions." Effective April 1991, regulation 1262 mandates (rather than merely permitting) individual adjustment of base year NOI under the specified circumstances, to which a third has been added: "base year rent was below prevailing market rents for comparable units in the base year." (Reg. 1262(C)(3).) Thus, in an unprecedented interpretation of a rent control ordinance, the Board permits half of all base year rents to be increased automatically to the median. This increase has no direct relationship to fair return on investment, the rationale the lead opinion uses to uphold it.[10]

The lead opinion asserts the Board enacted regulation 1262(C)(3) "to comply with *Birkenfeld* and its progeny," (lead opn., *ante*, p. 957) that it was "guided by the decision" (lead opn., *ante*, p. 961) in *Vega v. City of West Hollywood* (1990) 223 Cal.App.3d 1342 [273 Cal.Rptr. 243], and that it concluded such an adjustment mechanism was mandated by those decisions. If so, the Board was mistaken. Contrary to the lead opinion's repeated but unexamined conclusion, neither *Birkenfeld* nor *Vega* "required rent boards to allow upward rent adjustments in these circumstances." (Lead opn., *ante*, pp. 966, 982-983.)

In *Vega*, the rent control ordinance (like Berkeley's) contained an express presumption that net operating income produced by property during the base year provided the landlord a fair return. The presumption could be rebutted by a finding that, "The rent on the base date was disproportionately low due to the fact that it was not established in an arms-length transaction or other peculiar circumstances." (*Vega v. City of West Hollywood, supra*, 223

---

[10]Regulation 1262(C)(3), does not define the term "prevailing." According to the dictionary it means: most frequent, generally current, common. (Webster's, *op. cit. supra*, p. 932.) Section 10 of the ordinance provides that "where no rent was in effect on May 31, 1980, or during the six months preceding that date, the base rent ceiling shall be a good faith estimate of the *median* rent in effect for comparable units in the City of Berkeley on May 31, 1980." (Italics added.) Thus, it is reasonable to suppose, as at least one Board hearing officer has done, that regulation 1262(C)(3), permits upward adjustment of all base year rents below the *median*, affecting half of all rent-controlled units. This reading is supported by the addition in the most recent revision of regulation 1262, effective February 5, 1993, of a provision that adjustments under (C)(3) may not be granted to a unit whose base rent was set according to the quoted portion of section 10 of the ordinance.

Cal.App.3d at p. 1345, fn. 1.) It was uncontested in *Vega* that "peculiar circumstances" had caused the individual landlord's base rents to be "disproportionately low." The issue was how to determine the *amount* of the base rent adjustment to which she was therefore entitled. The court ordered her base date rents set in a manner consistent with evidence of rents for comparable units. Since it was undisputed that the landlord was eligible for a base rent adjustment, the *Vega* court did not even address the issue raised by Berkeley's new comparable rent regulation.[11]

In *Birkenfeld* v. *City of Berkeley*, *supra*, 17 Cal.3d at page 169, the court held a base rent adjustment mechanism was constitutionally necessary to provide for "situations in which the base rent cannot reasonably be deemed to reflect general market conditions." As one factor that might have prevented base rent from reflecting general market conditions, the court mentioned "the existence of a special relationship between landlord and tenant resulting in an undercharging of rent." (*Id.* at p. 168.) This is the source of the "arms-length transaction" provisions in the ordinance at issue in *Vega* and in Berkeley's regulation 1262, both of which focus on the manner in which base rents were set rather than on the outcome.

The challenged "comparable rents" provision is not mandated by *Birkenfeld* because it requires no showing that rents were set in such a manner that they cannot be deemed to have reflected general market conditions. Neither *Birkenfeld* nor *Vega* suggests, even in *dicta*, that all base rents which fall below "prevailing" rents for comparable units were necessarily set under other than market conditions and should automatically be increased. The most that can be said is that they were on the lower end of the range established by an unregulated market, which the ordinance presumes provided a fair return on investment.

My analysis is bolstered by the recent case of *Apartment Assn. of Greater L.A.* v. *Santa Monica Rent Control Bd.* (1994) 24 Cal.App.4th 1730, 1736 [30 Cal.Rptr.2d 228] (review den. Aug. 11, 1994) in which the court entitled the first section of its discussion, "There Is No General Constitutional Entitlement to Base Date Rents Adjusted to Market Levels." The court explained, "Though both [*Birkenfeld* and *Vega*] stated that the base date rents should reflect general market conditions, in both cases the landlord's entitlement to an increase in the base rent depended on the existence of circumstances that prevented the base rent from reflecting market conditions. . . . Neither case

---

[11]The lead opinion consistently mischaracterizes certain statements in *Vega* (e.g., 223 Cal.App.3d at pp. 1349, 1351, 1352) as "holdings." (Lead opn., *ante*, pp. 961, 983.) In context, these broad generalities mean at most that "comparable rents" are more appropriate criteria than fair return on individual investment for adjusting base rents not established in arm's-length transactions.

held that all landlords have the right to have their base rent adjusted merely by showing that the base rent was below market.[7] Respondents' position that '*Birkenfeld* and *Vega* establish a constitutional standard of general application to all historically low base rent properties without exception' is not supported by the opinions in those cases, and we hold that there is no general entitlement to an increase in base date rents predicated on market conditions." (*Id.* at pp. 1736-1737.) In footnote 7, the court observed, "Indeed, the *Vega* opinion begins, 'The issue in this case is how, *under a particular municipal rent control ordinance and peculiar circumstances*, rental rates must be determined.' (223 Cal.App.3d at p. 1344, italics added.)"

Since *Vega* does not compel regulation 1262(C)(3), does the ordinance permit the Board to adopt it? This is the dispositive question, the one which the lead opinion once more fails to ask or answer. The ordinance contains no express provision at all for base rent adjustments. Section 12, which governs IRA's, provides in subdivision (c), "In making individual adjustments of the rent ceiling, the Board or the hearing examiner shall consider the purposes of this Ordinance and shall specifically consider all relevant factors, including (but not limited to): . . . (8) The landlord's rate of return on investment." Subdivision (c) concludes, "It is the intent of this Ordinance that individual upward adjustments in the rent ceilings on units be made only when the landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment." Thus, the ordinance clearly denies the Board the authority to enact a regulation automatically raising all base year rents below the median to the median, unless necessary to provide a fair return on investment.

Although the original express "fair return" language does not occur in later versions of regulation 1262, it remains logically implicit. Otherwise, the entire regulation would be prohibited by the governing section of the enabling legislation.[12] Read to conform with the ordinance, regulation 1262 sets out the circumstances which will establish a presumption that base year NOI did not provide a fair return on investment, which can be rebutted by contrary evidence. A regulation automatically increasing rents merely because they are below the median is unauthorized by the ordinance unless it is shown to be necessary to provide a fair return on investment. Since there is no reason to believe that every unit renting for an amount in the lower half of the range established by an unregulated market failed to provide a fair return in 1979, the ordinance does not permit (C)(3) in its current form.

[12]The Board seems to have recognized as much when, in the current version of regulation 1262 (amended since this litigation began), it added, "Adjustments of current lawful rent ceilings under this subdivision (C) may only be awarded in conjunction with an NOI analysis under regulation 1264," that is, the "fair return" regulation.

To summarize, neither *Birkenfeld* nor *Vega* requires the challenged comparable rents regulation. The Constitution requires a fair return on investment. The ordinance presumes base year NOI provided a fair return on investment. Regulation 1262 enumerates certain unusual circumstances in which it may be presumed that base year net operating income did *not* provide a fair return on investment. Such a presumption does not reasonably arise from the mere fact that base year rent was "below prevailing market rents for comparable units." Therefore, the ordinance does not permit subdivision (C)(3).

A brand new "historically low rent" regulation, regulation 1280, provides for units with 1979 rents below 75 percent of HUD rents for Alameda County in 1979,[13] automatic increases up to that 75 percent level adjusted to reflect all AGA's granted since 1979. The administrative record suggests regulation 1280 was intended to be an alternative "quick 'n' easy" version of the comparable rent regulation just discussed. In essence, regulation 1280 allows some landlords with low base year rents to escape such burdens as gathering and presenting data on comparable rents for comparable units in the base year, and making a "fair return on investment" showing (in the absence, as we have noted, of appropriate guidelines). In return for this procedural shortcut, these landlords accept a preestablished limit—75 percent of the HUD figures—on their rent increases. Such an increase may or may not result in a fair return on investment since the regulation provides an increase without considering whether the landlord already receives a fair return on investment.

The lead opinion upholds regulation 1280 on the same bases as it upheld regulation 1262(C)(3). Under the analysis we applied to that regulation, regulation 1280 as enacted must also fail. It is not required by *Birkenfeld* or *Vega*, and exceeds the bounds of the ordinance to the extent that it circumvents the individual petition process[14] and grants adjustments of base year NOI without regard to fair return.

---

[13]Neither the record on appeal nor the parties' briefs document the exact source or nature of the HUD figures employed in regulation 1280, which are described therein as "fair market rents." The lead opinion calls them rent levels "certified as reasonable by the federal government" (lead opn., *ante*, p. 984). Unspecified "information before the Board" allegedly indicated that Berkeley units rented at market rates in 1979 had rents at or above 75 percent of the HUD figures.

[14]The author in the lead opinion states the Board has power to grant rent adjustments "through the IRA process." (Lead opn., *ante*, p. 984.) But the very point of regulation 1280 is that it allows certain landlords to obtain rent increases merely by applying for them, without going through the IRA process. The *Board's* suggestion that minority landlords need this "simplified procedure" because they are somehow incapable of complying with regulations 1262's procedural requirements is profoundly troubling. I agree with the lead opinion that the Board should respond to concerns about its bureaucratic maze and delays in hearings (*no*

On the other hand, it would not be unreasonable for the Board to create a rebuttable presumption that rents falling below 75 percent of HUD rents for Alameda County in 1979 failed to provide a fair return on investment. Thus, regulation 1280 might validly be recast as a replacement for the comparable rent regulation 1262(C)(3). That is, the criterion embodied in regulation 1280, subdivision (b) (base year rents below 75 percent of HUD rents) which now establishes an automatic right to rent increases in specific amounts might replace the arbitrary and unreasonable criterion (base year rents below prevailing market rents for comparable units in the base year) as the third basis for an individual adjustment of base year NOI, subject to fair return analysis.

## IV.

I cannot agree with my colleagues that the regulations providing for inflation-indexing of the debt service portion of NOI or automatically increasing rents which were below the median for comparable units or were "historically low rents" are either required by prior case law or within the Board's discretion. On the contrary, I conclude the case law does not require nor does the ordinance permit the Board to adopt such regulations. Moreover, I believe the source of our disagreement is our very different understanding of the "logical foundations of . . . rent control . . . itself." (Lead opn., *ante*, pp. 968-969.)

The lead opinion obviously believes ". . . the proper purpose of rent control, as limited by constitutional standards, is to allow local rent boards *to* set rent levels at fair and reasonable levels—which protect the value of property owners' investments in their property from confiscation by maintaining their net operating income against the continual and progressive ravages of inflation." (Lead opn., *ante*, p. 974.) But this statement turns rent control on its head! The purpose of rent control is to control rents, to keep them down, to protect tenants from landlords who may be greedy. This is especially so in Berkeley, where the purpose provision of *the rent control* ordinance is essentially a statement of tenants' rights, as recognized by *Fisher*. The constitutional standard (fair return on investment) which limits rent control (even in Berkeley) is what protects landlords, ensuring that rent control does not go so far in protecting tenants that landlords' property is confiscated.

Perhaps we differ as well in our understanding of the "respective roles of administrative agencies and the courts." (Lead opn., *ante*, p. 976.) The lead opinion stresses the deference which courts generally accord to administrative agencies, but ignores the deference we owe to an ordinance enacted by

evidence of which *is in the* record before us), but it demeans minority landlords to have a simplified process only for them.

initiative of the people, " ' "one of the most precious rights of our democratic process." ' " (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 248 [149 Cal.Rptr. 239, 583 P.2d 1281], citation and internal quotation marks omitted). In this case, we are presented with an administrative agency which, for historical reasons, may well be irremediably at odds with its enabling legislation. Not so long ago, really, but in a different time, the people of Berkeley adopted an ordinance which was meant to and did impose strict limitations on rent increases. Much more recently, they elected what is sometimes referred to as a "moderate" rent board. Does this mean Berkeley has changed its collective mind about rent control? Maybe so, maybe not; it is not for us to decide. Until the ordinance is repealed or amended, our job is to ascertain what it says and what authority it gives to the Board, not what we think perhaps Berkeley voters or the Board, might now wish it said.

The lead opinion concludes, "The net effect of our decision will be to return to rent boards the task of interpreting and shaping the regulatory details of the rent control process . . . ." (Lead opn., *ante*, p. 987.) I agree, but based upon the lead opinion they will now be able to do so without regard to the limitations placed upon their power by their enabling legislation.

The lead opinion apparently believes that by electing this Board, the citizens of Berkeley have signaled their disenchantment with stringent rent control, so we ought to help them out by reading into their ordinance a grant of discretion broad enough to permit the enactment of what we consider "reasonable" regulations. It may be that courts have already intruded too far into the legislative process where rent control is concerned. But there is a difference between judicial construction aimed at preserving the constitutionality of an ordinance passed by the people, and judicial construction which essentially undermines its very foundation. To paraphrase the court in *Abramson* v. *City of West Hollywood* (1992) 7 Cal.App.4th 1121, 1128 [9 Cal.Rptr.2d 507], no matter how great the deference or how strong the policy, I am unwilling to read into the ordinance a grant of authority or discretion which does not exist. To do so, in my view, is to engage in unwarranted judicial activism.

The petition of appellant City of Berkeley for review by the Supreme Court was denied December 1, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.